# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION



FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

MAR 0 4 2022

KEVIN P. WEIMER, Clerk
By: _____ Deputy Clerk

**Roobina Zadoorian**

*Plaintiff,*

**v.**

**Gwinnett Technical College (Ms Kimberly Strong**-Director of Sonography Program, **Mr Jim Sass**-Dean of Health Imaging & Informatics, **Ms Rebecca Alexander**-VP of Academic Affairs)

**Mr Derek Dabrowiak**(Executive Director, Student Affairs - TCSG)

**Office for Civil Rights** - Atlanta and Dallas

*Defendants,*

Case No.:

**1:22-CV-0922**

**Jury Trial Demanded**

## JURISDICTION & VENUE

1.  This Court has jurisdiction over the subject complaint since it is against

Intentional discrimination in admission to the Sonography program of Gwinnett

Technical College and Retaliation by the College and its employees against the

Plaintiff, which both are covered under Title VI, and supported by US Constitution.

2.   This Court has subject-matter jurisdiction because this action arises under the

U.S. Constitution and federal law.

3.   This Court has jurisdiction, because this is also an Administrative Procedure Act

against the Office for Civil Rights, Department of Education.

4.   This Court also has jurisdiction, because the subject complaint condemns the

College for their violation of 13th amendment of the US Constitution.

5.   Venue is proper in this Court, because both the Plaintiff and Gwinnett Technical

College where the admission process and the complaints were handled are situated in

Gwinnett County, Georgia.

## Introduction

6.   My name is Roobina Zadoorian. My ethnicity is Armenian.

7.   There are about 11,000,000 Armenians living throughout the world, almost

3,000,000 of them living in Armenia. In the US, the population of Armenians is

about 1,500,000 most of them living in California.

8.   Armenia was the first nation to adopt Christianity as an official religion in 301

AD.

9.  We have very talented, successful and famous Armenians around the world: Mr Noubar Afeyan the co-founder and CEO of Moderna, Mr Artem Patapoutian, the Nobel Prize laureate of 2021 from California, Artem Mikoyan the inventor of MiG aircraft, Aram Khachatoorian the great compositor of "sabre dance" to name a few, etc.

10.  In 2021 Joe Biden has become the first US president to declare formal recognition of the Armenian genocide, more than a century after the mass killings of more than one million Armenian by Turkey in 1915.

## My College admission

11.  When I came to the US at 38 years of age in Nov. 2009 and married to my husband we did not have much. Although I was fairly fluent in English and had a BS in physics I could not find a job to support my husband. At the same time we tried to have a baby but with no success. The IVF was too expensive for us and it was not a foolproof procedure, too. Therefore, we decided not to do it. When I was 43, right after my citizenship oath I came to know that I was pregnant naturally, but unfortunately I miscarried and lost our baby.

12.  After that I decided to continue my education in Gwinnett Technical College, because it was located near to our apartment, almost 20 minutes drive, and also more

affordable. I attended to the orientation session for the Sonography program with my husband and decided to apply to the program. I talked to Advisors and took my Compass exam in fall 2016 with **Reading 96**, **Writing Skills 99**, **Pre Algebra 95**, **and Algebra 96**.

13.  According to the invitation letter of the Gwinnett Technical College for my registration (exhibit 9) in 2016 I registered in the Healthcare certificate "in preparation for the competitive health program selection process". I passed all my pre-requisites with excellent grades, with grade average above 95(A+).

14.  We did not have enough money, and when I came to know about American opportunity tax credit I became very glad that I could get some of the money I spent for college back in our tax return. Since I did not have much money and I did not like to borrow; (I believe as bible says God likes me to always lend and not borrow), therefore, I decided to study those courses that College Board accepted us to CLEP by myself- meaning to study at home and only go to the College to take the final exam. Getting help from the internet free resources, I successfully passed my college algebra, psychology and terminology exams with excellent grades and could save about $1,200 money.

15.  In the applicant assessment check List (exhibit1) for sonography associate program, there is a category "volunteer as a patient in the DMS lab: 1 point per hour,

up to 6 hours". The College claimed those 6 hours were voluntary/optional, but anyone who did not participate would lose 6 points in their application process! Although Ms Strong could have asked her own students of degree level to act alternatively as patients for each other, the applicants spent a lot of their times for setting up appointments, commuting, waiting and acting as patient for Ms Strong's sonography lab, besides tolerating discomfort, cold gels, painful pressure from the probe, etc.

16.   It was my first session in the sonography lab serving them as a patient and I was anxious. I was not sure that sonography was safe, especially when done by the students who were not professionals. While I was standing and watching students scanning, suddenly there was a loud argument between one of the lab coordinators, Ms Kara Caldwell and a student who was late and also behind her schedule in the lab; then Ms Caldwell came to me and very arrogantly ordered me to be scanned by that student. I told her that I was willing to wait to be scanned later. The lab coordinator started to shout at me and told me that I should follow her orders and go through that scan or I would not be able to be accepted in the program. At that moment I was very distressed due to her threat, but still rejected her order. I thought I was not responsible for compensating for their backed up schedule. I was so humiliated and felt embarrassed.

17.   I waited there until another student wanted to scan me. Just before that student started her work, Ms Strong, the Director of the sonogrphy program, came to me; I think one of the students or Ms Caldwell had reported the incident to her. She sat in a chair opposite to where I lied down and was looking at me with a smirk on her face. Ms Strong blamed me, and ridiculed me because I was afraid that sonography might not be safe and she even harassed me by saying "It was none of your business", and that I should have followed her associate's orders. I was fighting back my tears. I felt very humiliated in front of all those students. I tried to explain to her that I was a volunteer and did not have any obligation to them and that I was sorry about the conflict that happened as if I was guilty!

18.   Ms Strong also said that Ms Caldwell was her former student at Athens Community College, she had hired her and was very satisfied with her. Therefore, she had a history of favoritism in recruiting. She had hired her previous student from Athens Community college from years 2008 to 2010. Most of the sonography program students that she accepted were from Athens, or Athens Technical College, where she went to college, or Jefferson where she lives, or from North or Northeastern part of Georgia! Only a few of them are from Buford and also Lawrenceville where Mr Sass lived and where the College was located. I think there should be some relation, otherwise mostly white Americans who come from eastern

part of GA where she lives or went to college and almost nobody from west, south, southwestern part of Georgia seems very odd.

19. From Gwinnett Tech catalogue: "We treat people with respect."

20. **Commitment**: "We are devoted to our job, **accountable** to our students…"

21. Values (**integrity**): "We say what we mean."

22. The College changed the admission criteria behind the scenes **after the applications were submitted** and changed it in the direction of their last years' agenda of taking as much as white American applicants as they could. In datausa.io website shows that 33.8% of students enrolled in Gwinnett Technical College are Black or African American, 31.9% are White, 17.6% are Hispanic or Latino, 8.2% Asian, etc. When it comes to lucrative degree programs like Sonography program, the balance of Ethnicity ratios is shifted towards White Americans with 80-90% of occupancy vs. 10-20% for Black or African American, Hispanic or Latino, and Asian combined. This fact is evident in the graduation photos (exhibit 41 & 42).This is a very different Ethnicity ratio from the other programs with lower prestige and lower salaries in Gwinnett Technical College. It is the College's discriminatory aim and intent to act as a gatekeeper for the sonography program as one of the most growing, lucrative two-year degree programs. In (exhibit 42) which are graduation photos for 2018, in one photo it can be seen that three of the ladies from total of thirteen students

are not white American; it is very interesting that <u>in another photo of the same graduation year, all the ten white American students are present together with Ms Strong, but those three minority ladies are missing. The segregation and discrimination by Ms Strong and the College in the sonography program is being seen and felt as a very obvious, tangible and undeniable fact in this evidence photo.</u>

23.  I want to mention here that I do not have anything against those white American students accepted to the songography program in Gwinnett Tech, but I also believe in equal opportunity and fair selection based on qualification and merit, and with the College following their announcements and promises. The College reserves a certain percentage for White Americans each year first, by introducing a criteria like interview, TEAS exam and essay in which White American students always achieve the highest scores, and giving that discriminatory category the dominance in the selection process in a deceitful manner <u>behind the scenes</u>. And, second, by not announcing the details of their point system as they did in 2017 and also this year when I sent them email and asked for 2022 criteria. They do so in order to manipulate the points behind the scenes for their agenda of having their desired number of White American students to be listed in the upper rows of their excel spreadsheet.

24.  From Gwinnett Tech. catalogue: IV- Definitions (from catalogue): **"Unlawful harassment** (other than sexual harassment) Verbal or physical conduct

that disparages or shows hostility, or aversion toward an individual because of that person's race, color, religion, gender, national origin, age, or disability and which"

1) has the purpose and effect of creating an intimidating, hostile or offensive educational environment, or

2) has the purpose or effect of unreasonable interfering with an individual's educational performance.

All students are encouraged to report any act of unlawful harassment, discrimination, retaliation, and intimidation. Reports will be treated in an expeditious and confidential manner."

25. I let the College know about Ms Caldwell's and Ms Strong's harassment and rude treatment with me which was unreasonable, hostile, intimidating and not at all necessary, and later, Mr Sass's retaliatory behavior toward me, but they did ignore them all. Ms Caldwell, Ms Strong and Mr Sass were hostile toward me from the beginning, from the first time I met each of them. They did not want to see me in the sonography program from the beginning and they showed their hatred in the way they treated me, while there were other white American students in their lab, but they only harassed me and treated me in that hostile, condescending and intimidating manner. The College also supported them and did not respect me at all. This shows how

discriminatory and unfair their actual policies are, despite those lies they write in their catalogue about their policies.

26.    Ms Strong not only knew me by name before application to the program on May 20, 2017 but also she knew my GPA well ahead of the application process! One day, after finishing my patient session (volunteering) in the sonography clinic/lab I stood to talk to her about the application to the program like all other students. I remember I was so happy and energetic and thought she would get excited to know that I was a GPA 4.0 student.  She not only did not show any excitement for me but suggested me to apply for less competitive programs like radiology! Ms Strong did not want me to be accepted in the sonography program and she intentionally changed the GPA point assignment behind the scenes accordingly to give other less qualified students excess points for their GPA so that they could score a higher total point than me as I have proved in my prima facie case.

27.    Radiology program as I have seen in their graduate photos is much more diverse than sonography; the reason is that its growth until 2029 is only 7% vs. 17% for sonography, its median salary is around $62,000 vs. $74,000 for sonography, and a radiology technician is exposed to radiation all the times vs. sonography technician's safe working environment. Therefore the College does not care much about radiology as much as they control who enters their sonography program. Ms

for sonography, its median salary is around $62,000 vs. $74,000 for sonography, and a radiology technician is exposed to radiation all the times vs. sonography technician's safe working environment. Therefore the College does not care much about radiology as much as they control who enters their sonography program. Ms Strong certainly did not want to see me in her Program, Sonography. Apparently nobody in the College wanted to see me in the sonography program as Ms Rebecca Alexander in her letter (exhibit 8) wrote: "I encourage you to meet with your program advisor regarding other program options that may be available to you and continue forward with what you have learned from this experience." I do not understand what she meant when she said continue forward with what I had learned from that experience. What I had learned? That I should not venture for entering sonography program? That I should look for other lower programs?

28.   I applied to the sonography program in 2017 May 20; at the same time I was registered in summer semester in "Introduction to Statistics", and "Humanities" courses which were required but not necessary to pass before the application deadline which was May 20, 2017. I was very busy and overwhelmed, because the College kept changing their acceptance criteria and I was highly stressed to satisfy the entire requirement in order to get entrance to the program.

29.   They introduced TEAS exam in February 2017 just 3 months left to the application deadline. <u>TEAS, The Test of Essential Academic Skills, as the publisher explains: "measures basic skills in academic content areas of Mathematics, Reading, Science, English, and Language Usage".</u> It is discriminatory in it nature since 50% of the test is measuring English language proficiency in which White American students are scoring higher both because English is their primary language and also they can afford expensive learning material, yet they were allowed to take it twice and submit the higher score and they could easily afford that one too.

30.   Although it is not clear whose idea it has been to introduce TEAS to Health Sciences selection criteria, and how valid this test can be in any measurement of academic basic skills let alone to predict the success in the sonography program. <u>It is enough to say that in 2022 report of Gwinnett Tech. for their sonography program retention rates (exhibit 29), five out of sixteen selected students of the sonography program were shown to have withdrawn from the program so far, which is 31.3%!</u> I sent an email to ATI TEAS and asked who had authorized their exam for Health Sciences selection process, and if it was a standardized test? Or how valid its measurement was, but they did not have any answer; they told me to contact my college about the test. ATI TEAS is now making huge profit by selling their online or printed learning material, selling their practice tests, and real tests etc. It is a huge

business now compared to just a few years ago in 2017 that I first took the test. Each student is allowed to take the test several times a year, each test costing more than $100. ATI shares their profit with the Universities and Colleges for adopting their exam for their selection criteria, and Regents and TCSG get their chance of implementing their discriminatory agenda through TEAS exam and that's why Regents and TCSG have voted for it. It's a win; win for ATI, and Regents and TCSG.

31.  There are even companies that get paid for taking the TEAS exam instead of the students and they guarantee the score the students want or they refund the money (exhibit 31). When I sent an email and told about this widespread cheating to Mr Dabrowiak in TCSG a few weeks ago, he said colleges are allowed to use any selection criteria as long as it is not subjective. I told him how different colleges consider different weight for TEAS like some of them consider 60% for TEAS and 40% to GPA, Some 40% to TEAS and 60% for GPA, yet another gives 4 points to GPA and 10.3 points to TEAS (Gwinnett Technical College), or do not even reveal their point assignment details to the applicants (Gwinnett Tech), as if he himself did not know about these facts, and asked if it was still non-subjective. He did not answer my email (exhibit 43).

32.    Towards the end of February 2017 the College announced that students could take TEAS twice with one month interval and submit their higher score; the payment for the first time exam was $50 (now $107) and $75(now unknown) for the second time. There were also some online preparation tests and material that we could buy on the ATI TEAS website; for example two tests each for about $48.

33.    The updated criteria were announced in February 2017 and according to their criteria GPA had 40 point and TEAS had 30 points (exhibit 1). There were some other categories also in the criteria with less points and therefore lesser importance, such as 6 points for 6 hours of voluntary sonography lab presence, 3 points for completing all prerequisites for 3 more courses- these 3 courses were those courses which were not required to be passed prior to the application, and never in previous years were included in the criteria-, 20 points for essay –which academic affairs said it was 8 points not 20 in their response letter to my complaint, as Ms Strong had given me only 5.5 points from the possible 20 points, yet Ms Tavia Thurmond the program specialist told me it had only 7 points! There was no transparency and consistency in what the College claimed. There were also other points for completing a few other courses.

34.    I got 86% for my TEAS exam, which showed I was in 96 percentile, which meant my score was higher than 96 percent of all students taken the exam

nationwide. Since I did not know they were going to include those 3 courses in the point criteria, I just had taken them and was in the process of passing 2 of them, therefore I lost 2 points although I passed them before the start of the program and with 102 for Introduction to statistics and 99 for Humanities. I also lost one point because I did not have any experience of working in healthcare. Since I had GPA of 4.0 and as the GPA had the highest points, i.e. 40 points among all other categories, naturally I was very positive that I would be among the accepted candidates.

35.  The College sent me an email on June 12, 2017 that I was rejected from the sonography degree program. I felt bad and also was surprised, because I knew that I was at top of all my classes with the highest scores. I had tried very hard; and still I was studying for my Statistics and Humanities. I tried not to get despaired. I went and talked to the enrollment advisers and they told me that the students accepted to the program had GPA as low as 3.6 and TEAS as low as 85%. I had GPA 4.0 and TEAS 86%. Therefore I asked my husband to accompany me to go to see Ms Strong, the Director of the program and Mr Sass, the Dean of imaging programs, in the College one afternoon and see why I had been rejected, while I had higher qualification.

36.  We went to building 200 on the campus where Mr Sass's room was; the door of his room was wide open, but he was not in his room, he was casually talking

to one of the girls working in her room in the same hallway leaning on the door post of her room. When I said I wanted to talk to him about my rejection, he said they did not accept appeals, when I said I had a complaint he said he had no time and I should take an appointment in order to talk to him. I explained briefly what I wanted to talk about and he set an appointment for the next morning.

37.   Then I looked for Ms Strong and found her in her room; I asked her some questions about my status, but could not get much information. She just told me one student who was accepted ahead of me had TEAS 88% and GPA 3.6, the other had GPA 4.0, TEAS 85%, or another had TEAS 89% and GPA 3.6, nothing more. I asked her to give me a copy of the criteria according to which she had done her final selection. She walked in front of us to a room were the printer machine was and got the three pages that she had printed and gave them to me (exhibits 2,3& 4), all of these 3 pages where unofficial papers without the header of Gwinnett Technical College which their announced criteria (exhibit 1) had on top of them. Two of those pages  were containing tables for breakdown of points and tables for the essay, 3 required pre-requisites, TEAS and GPA points according to which she had rejected me and one page(exhibit 4) was my line of points for different categories from the excel spreadsheet she had prepared for the applicant points.

38.   When I got home I took a look at those three pages that she had given me and I noticed so many controversies, and incoherence among those pages by themselves and also with what previously was announced to us. I decided to raise the issue with Mr Sass during the appointment I had with him the next morning.

39.   The next morning my husband and I went to talk to Mr Sass. It was June 15, 2017. I asked questions about those controversies and things that were different from what they had announced to the students as their selection criteria. One of the categories was the essay. In the table for breakdown of the points both in those announced copy (exhibit 1 ) and in the unofficial print that I got after my rejection(exhibit 2) the essay was assigned 20 points. There was a separate table explaining points for essay just under that main table (exhibit 2); it only had five rows and each row was giving two points for different satisfactory specifications of essay, like "Directions followed", "thoughts well expressed", "neat and legible", "correct grammar", and "experience/shadow/Re-application". When I said the sum of those points was 10 not 20, he said that each row should be multiplied by two. I told him, I had followed the directions, it was also neat and legible, and my grammar was not too bad also; if each row had 4 points I should at least get 8 points. I asked him why she had given me 5.5 from 20. **He got angry and told me "If I**

**were her I would have given you zero."** I did not understand why he was talking to me like that.

40.    In my essay I had explained how I fell in love with the human body through studying anatomy and physiology and by learning about all the mysteries that take place in it and that how organized and energetic I felt, how much I liked studying it more deeply and that my physics degree was also a great help in learning math and physics courses. Then I had explained about my miscarriage experience and how despite I was still getting positive pregnancy tests my ultrasound showed no red color around my embryo which meant there was no life there anymore! I wrote in my essay that was the moment that inspired me to study ultrasound and to help people find out about the problems in their bodies. Then I added that I was very enthusiastic and full of energy and aimed for the highest achievement possible in my degree and in my life. **That was not an essay deserving a zero**.

41.    His attitude towards me was because of the hatred that he was feeling towards me; first, I was not white American, second, I was trying to prove to him that I was wrongfully rejected from the program. He did not have <u>any explanation as for my</u> <u>rejection, because they had rejected me intentionally and according to a pre-</u> <u>meditated agenda, and he felt under pressure since I was challenging him, Ms</u> <u>Strong, and the College to prove me that I was rejected according to their announced</u>

criteria and not what was created after the facts and after the submission of the applications.

42.    Then I showed in those unofficial pages (exhibit 2) **which Ms Strong had created after the applications were submitted** that the GPA was not scaled according to what they had claimed previously in their announcement (exhibit 1). In the same unofficial document in the breakdown of the points for different categories they had written 40 points for GPA which is the highest points among all categories and gives you the idea that GPA is the most important factor in the applicants' selection; but **in the table for GPA created after the submission of the applications** where they had assigned points for GPA, it was showing only 12 points instead of 40 points from the lowest acceptable GPA, 2.5equated to 28 points, to the highest, 4.0 which was equated to 40 points.

43.    The correct scale for GPA according to the announcement of the College and following the method of Ms Strong for TEAS scale (table 1 of exhibit 19), is shown in table 3 of exhibit 19 with the explanation in (exhibit 20, 21, 28). **The College had changed the GPA points after submission of the applications and** had squeezed the gap between the 4.0 GPA and other lower GPAs rendering GPA 4.0 practically worthless! Besides, the lowest GPA in that table started from 2.0, whereas it was supposed to be 2.5, which was another controversy.

44. <u>They also had done another manipulation to GPA points **after the**</u>

**submission of the applications** <u>by directly equating the lower GPAs to higher</u>

<u>GPAs for example: 3.751- 4.0 = 4.0 and assigned the same points for GPA 3.751 as</u>

<u>what they assigned for GPA 4.0 which was a slap on the face of those of us with</u>

<u>GPA 4.0, **because Ms Strong was selecting the students strictly on the basis of**</u>

**their points and any interference with the applicants' points was interference**

**with the selection process.** I told Mr Sass that they had caused the other less

qualified students to get ahead of me because they had changed the criteria after

submission of the applications on behalf of those with lower GPA and had given

them free points, while I had not been given any extra points; therefore their sum of

points became larger than mine. When he started to tell me "Sonography was very

competitive and there were more students that they had room for, so they had to use

a competitive process", I answered him **what they had done after submitting the**

**applications** in assigning points to GPA table by directly equating GPA 3.751 to

GPA 4.0 was not in the direction he was talking about and that they were hurting the

GPA 4.0 students on behalf of 3.751 and lower GPAs. I said they were facilitating

better competition for one group, which were white American students with high

TEAS who could not earn high enough GPA, while debilitating the others like me

with the maximum GPA. **Since he did not have any answer he was just getting angry.**

45.   I mentioned the controversy with what they had previously announced, but he did not want to accept that the printed unofficial page (exhibit 2) **created after the applications were submitted** was wrong and was not consistent with what they had promised us before. Mr. Sass got angry and he refused to take any more questions from me, because <u>he did not have any answer to convince me why they had</u> **<u>changed the criteria after submission of the applications</u>** <u>and given the GPA only 12 points despite of the 40 points they had promised</u>. My husband and I left his room and went home.

46.   When I got home I saw his email in my mailbox (exhibit 6), it was his summary of our appointment that morning in his office sent to the College officials. He knew that I was going to write about his attitude and that **<u>he had told me he would have given my essay a zero</u>** if he was in the place of Ms Strong, and he probably did not want the College hear about that incident from me first.

47.   **Mr Sass's behavior towards me was so hostile, condescending and against all college and human behavior ethics and regulations,** yet the College, TCSG and OCR condoned his behavior and found nothing wrong with it. <u>His words and actions all were apparently screaming that he did not want to see me there in the</u>

College. He confessed with his mouth that he wanted to give my essay a ZERO. **He and Ms Strong changed the GPA points behind the scenes and gave less qualified applicants extra points to accept them and reject me.** Then the College hurried to their defense saying that because the same table was used for all applicants everything was alright. I was not given any extra points! They gave the other applicants including the applicant number 16 extra points for their GPA and accepted them saying they had more points! The very points that the College had awarded them illegally!

48.    On 06/19/17 I wrote a letter to Ms Rebecca Alexander (exhibit7), Vice president of the academic affairs and explained my meeting with Mr Sass, my encounter in the sonography lab with Ms Strong, and that Ms Strong had not followed the College's criteria in the selection process as it was announced to the students. I wrote that their equating GPA 3.751 to GPA 4.0 after submission of the applications was in controversy with their claim of the selection being a very competitive process, because they were interfering with our competition by awarding points to only some students and were hurting the GPA 4.0 students. I explained how Ms Strong **had changed the announced criteria after the submission of applications** and had given only 12 points to GPA instead of 40 announced points, and explained how the correct point assignment table for GPAs

from 2.5 to 4.0 on the scale of 40 points should be (table 3 in exhibit 19) which also would be in compliance with the very table of 30 point assignment for TEAS Ms Strong herself created. I explained how her controversial point assignment for GPA had caused my rejection despite my higher qualification. I proved in my letter that Ms Strong had acted on behalf of those students with high TEAS score but low GPA mostly white American applicants vs. those students with GPA 4.0 and relatively lower TEAS scores including me, which had caused my rejection from the program. Ms Alexander's answer (exhibit 8) in paragraph 3 of her letter was :

49. "It appears that the major point of issue is the grade point average (GPA) scale. **A student's GPA is one factor** considered in the application process and <u>the score is assigned based on a scale.</u> Your concerns and calculations regarding this process have been noted, and while I understand your dissatisfaction with the scale used<u>, the same established scale is used in selection to all applicants to the program and remains as such.</u> Your GPA score will stand as is."  She said "the score is assigned <u>based on a scale</u>". But that scale which was supposed to be used for GPA was 40 point scale for GPA from 2.5 to 4.0 not the one in that unofficial paper (exhibit 2) **created after the submission of applications** which is also not based on any logic and is only a post hoc definition of points according to the applicants they wanted to see on the first 16 rows of their excel spreadsheet. Besides, GPA was

supposed to be the most important factor by having 40 points vs. TEAS with 30 points, but suddenly after the applications were submitted, Ms Alexander changed GPA to be "**only one factor in selection**", not the most important factor! What's more, Ms Alexander herself said she understood my dissatisfaction from the scale used! She admitted that my dissatisfaction from the scale used was reasonable and right and she understood it, but then she defended what they did by saying that the same table was used for all the applicants. But she ignored the fact that the same table only gave extra points both directly and indirectly to the applicants who did not have 4.0 GPA! And that the same table did not give me any extra points!

50.   The College did not have the right to use <u>any scale they had established after submission of the applications</u>. The school did not respect their own announcement to give the GPA the points which were supposed to be given, 40 points, and not 12 points! **They kept defending themselves by repeating that the same scale was used in selection to all applicants and did not answer why they used different criteria from what they had announced.**

51.   I have proved that the unofficial GPA table created **after submission of the applications** (exhibit 2) by Ms Strong had an adverse effect on my selection and resulted in my rejection and acceptance of other less qualified applicants including applicant number 16 in my prima facie case. I have also shown in (exhibit 25 and

bank account example) that although the same criteria was used to all applicants but not all applicants were affected adversely.

52.   The College did not investigate the adverse effect that their changed criteria had on my selection as I had explained to them. They themselves knew the adverse effect, and the change of criteria **after submission of the applications** was intentional and was aimed to do so to help them to choose their desired pool of applicants. The academic affairs approved what Ms Strong and Mr Sass had done and said that I was not qualified and that I should seek other programs of study! They did not want to admit that **changing of the criteria after submission of the applications** had an adverse effect on me and caused my rejection; it was non-negotiable. They just covered it up.

53.   Ms Alexander said that GPA was only one factor in the student's selection, but she did not talk about the fact that they themselves had designated more points for GPA, 40 points,  than for TEAS, 30 points, in their announcements for the program selection criteria; also in their catalogue and in their invitation letter for my registering in their certificate level the College said that those prerequisites were the foundation of the sonography degree level and that I was registered in the certificate level in preparation of the sonography competitive selection. Suddenly after application, the GPA lost its value and TEAS exam became the main factor for our

selection; GPA descended from being the most important factor which had 40 points to the level of being only one factor with 12 points!

54.   To show how TEAS's language and usage questions were not at all reliable in measuring success in sonography degree program, I am presenting (exhibit 39) which shows the test included questions testing knowledge of difficult and unpopular words which a sonographer would never use during her career, and how a wrong answer to 5 of those questioned had brought done my score to 79.2.

55.   The College used TEAS to evaluate my qualification for the sonography degree program which does not have even one credit of English language, grammar, or vocabulary related course among its sixty one credits of Essential Technical Courses (exhibit 13). Besides, they **manipulated the GPA points after submission of the applications according to their excel spreadsheet** to make sure my score would be lower than other less qualified applicants including the 16th applicant, proved in my prima facie case.

56.   I had registered in the college as an answer to their invitation letter (exhibit 9 ) to register in their "Healthcare Science Certificate program **in preparation for the competitive health program selection process.**" The only reason I registered in Gwinnett Technical College Healthcare certificate program, was that **they were supposed to get me prepared for the competitive selection for the**

**Sonography degree level** .Therefore, my contract with the College actually started on June 27, 2016 when they sent the invitation letter after they had tested me for preparedness with Compass test in their College. During two years I paid them almost $4,000, studied very hard, was a disciplined student, studied hard in preparation for the competitive health program selection, literally soaked everything they taught me. I got my A+GPA, got A+ in the other 9 required prerequisites, prepared my application, took the TEAS exam, submitted my application, trusting that as what they claimed in their catalogue they were honest, committed, had integrity, and as they claimed they meant what they said. But, when I applied to continue in Associate degree level they said I was not qualified. Mr Sass for example in his letter (exhibit 6) said: "…we **use** a **competitive process to help us** find students that we hope will be successful and complete the program." The certificate program as they claimed was registering me to prepare me for the competitive selection. If after they themselves evaluated me with a GPA of A+ in my certificate level for sonography program, they found me unprepared and unqualified for the degree level so much as they had no hope that I would be successful and complete the program, it was not my fault.

57.    The College awarded me A+ in all they taught me in preparation for the sonography degree competitive selection process; therefore I am an excellent

learner. If I was not well prepared, that was because they did not teach me what I needed in order to be prepared. Or it was because **they changed the criteria after the applications were submitted,** and made the GPA of those foundation courses which was supposed to be the measure of preparedness for the competitive selection, of no worth!

58.   If my total point score was lower in the application process, it was because **they changed the criteria after the submission of the applications** and lowered the value of GPA 4.0 drastically. They had to stay loyal to their announced "Applicant assessment check List" (exhibit1) describing the criteria that the College would employ in evaluating the applicants and such constituted an invitation for an offer to apply.

59.   The filing of applications constituted an offer to have our credentials appraised under the terms described by the College and the Colleges voluntary reception of the application constituted an acceptance, the final act necessary for the creation **of a binding contract**.

60.   After I was sent an email (exhibit 10) on June 12, 2017 by Ms Tavia Thurmond (African-American), the program support specialist, that I was rejected from the program, I tried to get some information about my status among the other students as per what Ms Thurmond had told us we could get help with. A few weeks

later, on July 11, 2017, I went to see Ms Thurmnod. My husband and I were in the room with Ms Thurmond and she was looking up some information on her computer about my points. She said I was very close to those accepted students and suggested me to talk to Ms. Strong, the director of the program.

61. Suddenly Mr Sass, the imaging Dean intruded into the room and started shouting at me, my husband, and at Ms Thurmond and commanded her not to speak one more word with me; he said that since she was working for him, she should follow his orders, and intimidated her not to speak with me. He also told me that I should go away and wait for my complaint response. I told him I was there because of their own invitation in the rejection email they sent to me (exhibit10). He told me to go out or he would call the police to throw me out. My husband who is a very wise and decent man asked me not to resist and suggested that we leave the building 200 where we had been. Mr Sass was afraid that the information and input I could get about my points compared to the other accepted applicants could be used against him, Ms Strong, and the College and that's why he fought full force to throw me out. This is true, because with the information OCR gave me about my point difference with the last accepted applicant I proved my prima facie case!

62. When we came out we saw the police officer standing by his car and he was about to come in and throw us out. My husband and I were very distressed,

humiliated and felt oppressed; we had been treated like criminals! <u>My right of making inquiry about my status among other applicants and about how I did in each category or getting input from Ms Thurmond for improving in my next application was violated.</u> **My right of free speech was violated by Mr Sass.** <span style="color:red">Department of Justice condemns any kind of retaliation towards the complainants of discrimination by the recipients.</span> **My husband and I had been insulted, threatened, intimidated, and thrown out of the College by Mr Sass. The College was not his property; and my husband and I were not his slaves. After being in the College for more than thirty years and doing whatever he wanted, he thought the College was his property and he could throw us out of it.** After that incident I never went back to the college. Even thinking about the way he treated my husband, Ms Thurmond and me causes me a lot of painful emotions.

63. It would have been different if the school had announced from the beginning that GPA was going to have 12 pints, or GPA 3.751=GPA 4.0 = 40 points. In contrary they had shown in every table that GPA had 40 points; then after selection they suddenly showed a self-made scale giving GPA only 12 points and said I should accept it because the same scale was used for all of the students. Apparently, some of the students with higher TEAS scores and lower GPA scores benefitted

from that scale because this scale gave them extra points and made the gap between their GPA and 4.0 GPA narrower which worked on their behalf (exhibit 25).

64.  Gwinnett Technical College showed **disregard and contempt for prerequisite GPA from their own College, whereas as per their own catalogue is stated that those courses are serving as the foundation for further study in the degree level (exhibit 13), and accepted students from other colleges!**

65.  In paragraph 5 of Ms Rebecca Alexander's letter (exhibit 8 ) she says:"As you are aware, we have more applicants than available spaces for the DMS program. For this reason, the established application process is competitive and can be challenging even for high achieving students. While we have made note of your concerns, I find that the calculations of your application scores are correct and have been scored using the same criteria as all other applicants."

66.  They claimed the selection was very competitive; nonetheless they added points even directly to 3.751 to make it 4.0 and made GPA much less competitive; also added points to lower GPA indirectly by inventing a new criteria **after the submission of the applications** which gave GPA 12 points(exhibit 2) instead of 40. They did so while they claimed every decimal or even hundredth point as Ms Strong assigned for TEAS points (exhibit 3) counts in the selection process. This hypocrisy about TEAS and GPA point assignment without any logic or reasoning that why the

College suddenly **after the submission of the applications** decided that they wanted to select the talented students based on their TEAS exam scores to benefit white American students is the clear evidence of their discriminatory intention and a betrayal to students like me.

67.    Since as the College and Ms Strong claimed the selection process was strictly based on the sum of the applicants' points, as in OCR letter they told me I was behind the last accepted applicant by only 1.17 points, I was adversely affected by their change of criteria. The fact that the College did not feel any sympathy after knowing that their A+ student was rejected as the result of their discriminatory agenda is another proof of their premeditated conspiracy. Any impartial human will understand that my rejection was unjust and unfair, but the academic affairs stamped their wrongdoing by an approval stamp, trampling on me like I was not more than an insect buzzing around them and bothering them with my complaint for their injustice.

68.    On July 12, 2017 I sent an email to TCSG to Mr Dabrowiak(exhibit 11) and explained what I have explained in above paragraphs, and how I was unjustly rejected from the program. I also wrote about the retaliatory conduct of Mr Sass. In his reply Mr Dabrowiak said that TCSG does not overturn academically related decisions, grades, etc, and that the College followed their procedure for selection to

the program. (exhibit 12). What I was asking him was not to change my grades, I did not need his charity for my grades; I was demanding my right to be respected. I had told him that the College had not followed their procedure and criteria that they had announced before applications were submitted and had sent him what they had announced and explained how they had changed the point assignment criteria for GPA. He ignored my explanation that GPA was not given 40 points; he overlooked the fact that GPA was only given 12 points. Unless he was not able to count the number of points assigned to the GPA, starting from 2.5 (28 points) to 4.0(40 points) in Ms Strong's table for GPA (exhibit 2) consisting of only 6 rows (drawn in 8 rows intentionally by Ms Strong to make the table longer to not look too odd compared to TEAS table with 36 rows), he would have understood that there is a discrepancy in the College's point assignment. He did not refer to my complaint about retaliatory conduct of Mr Sass, either. He stayed completely ignorant!

69.    In June 2017 I wrote an online complaint to OCR Atlanta (exhibit 14) and explained them all that happened regarding my application process and told them that the College's newly invented unofficial criteria **after the applications were submitted** on a piece of white paper with no Gwinnett Technical College header (exhibit 2) which was not consistent with what they had previously officially announced was done for achieving their discriminatory goal of giving white

Americans advantage over me as a minority student. I explained that they did it by introducing <u>TEAS, which was 50% test of English language fluency and vocabulary and was discriminatory for me as a minority national origin student,</u> and also needed spending a substantial amount of money both for preparation and taking the exam twice. I quoted the Title VI laws and implementing regulations in my complaint to OCR.

70.   I filed a discrimination claim against Gwinnett Technical College with OCR (exhibit 14). I explained to OCR how Ms Strong had manipulated the criteria for GPA points that were announced prior to the submission of applications on behalf of white American students with high TEAS and low GPA vs. minority students like me with the maximum GPA and relatively lower TEAS. I also wrote about my complaints to the College and TCSG. They interviewed me on the phone, too. Then in a letter (exhibit15) they told me that they were going to investigate my discrimination claim. I sent them my consent signature and they started the investigation. I later sent them email to add some explanation that was left out in my initial complaint (exhibit 16). The only answer from them was that they would let me know when they had finished their investigation.

71.   In October 2019 after more than two years, I received a letter dated Sept.30, 2019 (exhibit 17) from OCR Atlanta; they had rejected my case. They had repeated

what the College said that the College did not subject me to a different treatment (summary of investigation on page 2). OCR themselves in page 4, paragraph 2 of their letter wrote: "Sixteen other applicants to the Program in addition to the Complainant had a 4.0 GPA which also earned them 40 points. There were 35 other students that also received 40 points because their GPAs fell within the 3.751-4.0 range, per the admissions criteria." But, what OCR referred to as admission criteria, was the unofficial table (exhibit 2) **created only after the applications were submitted,** which is in controversy with the aim of selecting the most qualified students in a very competitive and challenging process. In no announcements before submission of the applications we were told that GPA 3.751=GPA 4.0 = 40 points! The College treated me differently when they added points to all other students' GPAs while kept mine as 40. In my prima facie case I proved that if the College had not added points to the 16 applicant's GPA, who was a white American student I would have had more points and I would have been accepted to the program not her.

72.     Ms Strong did not follow the 2017 announcement, because according to that point assignment for GPA (exhibit 19, 20, 21, & 28) the points for GPA of the 16the applicant would be 29.33 instead of 38 points Ms Strong gave her (exhibit 2) and therefore my total points would be 38-29.33-1.17= 7.5 points more than her and my name would come before the 16th student and also before so many other applicants

in her excel spreadsheet and I would have been accepted. <u>According to my</u> <u>allegations OCR was supposed to investigate the facially neutral but discriminatory</u> <u>criteria TEAS and how the College's manipulated point assignment for GPA after</u> <u>the applications were submitted had adversely affected my status in the applicants'</u> <u>list; but even after I proved my prima facie case based on the information OCR</u> <u>Atlanta gave me, both OCR Atlanta and OCR Texas betrayed me and rejected my</u> <u>appeal without one word explanation!</u>

73.   The fact that Ms Strong also departed from the GPA point assignment criteria of 40 points that she had used in 2016 which was points for GPA= GPA×10, is also a prove of <u>her discriminatory intent of rejecting me</u>. **When she tried that on her** **excel spreadsheet my name came in the list of the accepted students before the** **16th student, and also other less qualified students.** She gave two more points to GPA of 3.6 in 2016 point assignment for GPA and instead of assigning 3.6×10=36 points to it, she assigned 38 points to it (exhibit 2) without any logical explanation, giving her 1.17 points advantage over me. While in fact I was 2-1.17=0.83 points ahead of that student if Ms Strong had used the same point assignment for GPA as she had used in 2016. But she departed from the previous year's point assignment for GPA because it was not helping her in rejecting me and selecting that white American student. <u>From the day she insulted and harassed me in the sonography lab,</u>

her hatred was obvious; she was determined to reject me and she did it by manipulating the GPA points.

74.   OCR did not write anything about the average GPA of those 16 selected students; it was an important statistic to show that GPA did not played any role in the selection of the students despite the College's misrepresentation of GPA points as 40 vs. 30 points for TEAS. Therefore OCR did not investigate the case impartially; they took side with the College despite my request to investigate the adverse effect of the College's GPA point manipulation on me.

75.   While in DOJ manual for title VI there are different methods of proof for investigating discrimination, among them disparate effect,  and statistical evidence, OCR did not efficiently used any method for investigating the effect of the College's discriminatory criteria. OCR never investigated the adverse impact the College's changed criteria **after submission of the applications** had on my status. Even when I proved my prima facie case in my appeal letter, OCR rejected my claim without any "letter of findings".

76.    OCR did not follow their procedures; they did not investigate my allegations. The first thing to consider in their planning, according to their manual, is the complainant's allegations! Different treatment was only one part of their investigation; the other part should have been the facially neutral criteria, TEAS

exam, and the College's manipulation of the GPA points to exaggerate the effect of their discriminatory criteria, TEAS exam. As it is mentioned in DOJ manual it is very seldom that a receiver will reveal their intention of discrimination; most of discriminations are done via facially neutral criteria.

77.   In their analysis on page 5, OCR Atlanta wrote The evidence does not show that the Complainant was treated differently than white students with regard to her application to the Program….OCR determined that the **criteria for the Program was neutral on its face and applied the same for all the applicants."** It is ridiculous; in DOJ manual for title VI is mentioned that the criteria may be facially neutral but yet discriminatory (exhibit 18). Therefore, OCR did not follow the instructions of the Department of Justice. They did not put any effort into investigating the adverse effect of the seemingly neutral criteria I explained to them.

78.   Yet, in fact I was treated differently in that I was not rewarded extra points for my GPA as student ranked 16 received. Considering the correct GPA points assignment according to the College's announced criteria for 2017 applications (exhibit 19- table 3), also approved by an experienced Math tutor for a scale of 40 point for GPA 2.5 to 4.0 (exhibit 20) exactly according to the 30 point scale of Ms Strong for TEAS points, and also approved by similarity to the Fahrenheit to Celsius point scale (exhibit 21), also calculated in (exhibit 28) in a very simple and

understandable way, **the points for 3.6 GPA would be 29.33 not the 38 points given to the applicant 16 by Ms Strong.** Ms Strong gave this applicant 38-29.33= 8.67 extra points, but I did not receive any extra points. If the applicant 16 was not given any extra points then I would have had 8.67-1.17=7.50 points more than her.

79.  According to the attached 2 pages of DOJ manual (exhibit 18), "The McDonnell-Douglas framework" **the defendant treated similarly situated individuals differently**; in my case <u>the College intentionally treated the applicant 16 differently by giving her GPA extra points despite what the announced criteria for GPA was</u>; the College also had departed from using the previous year's criteria for GPA, because it would still give me 0.83 points advantage over the 16th student (also proved in my prima facie case and exhibit 32), **therefore Ms Strong created the illegitimate criteria (exhibit 2) for point assignment to GPA after the applications were submitted to increase the points of the white American student and to reject me.**

80.  For at least one applicant whose point difference with mine was given by OCR I could prove that I would have been accepted in her place if her GPA was not increased by Ms Strong. **<u>Ms Strong did design that point assignment for GPA after the submission of the applications, because she wanted to harm me and not accept me in the program, otherwise she should explain where that table</u>**

came from, because it does not follow any formula, or any explanation, or method she used for point assignments to other categories, like TEAS. It also does not explain how it is a determinant of the applicants' qualification for example by equating 3.751 to 4.0 GPA. The only explanation for the creation of the GPA table in exhibit 2 is the trial and error in her excel spreadsheet that helped Ms Strong to adjust the GPA table according to the list of the students she wanted to see in the first sixteen rows of her excel spreadsheet, which was done after submission of the applications.

81.    The OCR Atlanta wrote in their letter, page 3, second paragraph after bulleted list, line 3: "The program Director stated that applicants are accepted into the Program strictly based on Application points." In the same letter, they have admitted (page 4, paragraph 2 line 2) "There were 35 other students that also received 40 points because their GPA fell within the 3.751 -4.0 GPA range, per the admissions criteria." That table of GPA (exhibit 2) was not the admission criteria for GPA (exhibit 1), but it was the table created after submitting the applications. OCR should have seen the controversy that the selection was based strictly on application points, and on the other hand the college had gifted points to some of the applicants only and therefore had interfered in the process, making it unfair!

82.   I sent my appeal to OCR Atlanta via email (exhibit 22) on 11/19/2019, and was informed that it was forwarded to OCR Texas (Dallas). I waited patiently without any update from them for a few months. I wrote to them after a few months, and they only said that they were still investigating. After almost two years they sent me these 3 lines. "After careful consideration of your appeal, I find that the issues raised in your appeal do not warrant a change in OCR Atlanta's disposition of your case under the laws and regulations enforced by OCR. Accordingly, your appeal is denied."

83.   After 4 years and 2 months of waiting and submitting my prima facie case and referring all my proof to the DOJ manual for title VI investigations, sent attached to my appeal letter, they denied my appeal without any explanation. They did not answer any of my questions sent to them in email (exhibit 24) after they denied my appeal (exhibit 23); neither did DOJ civil right division, when I called them and left a message on the phone or when I sent them email.

84.   I did not receive a proper "Letter of Findings" for my appeal letter; it is my right according to the OCR manual to receive a properly prepared letter of findings that states my allegations one by one and explains why OCR denied them by relating their explanation and analysis to the Title VI rules and regulations. I proved by preponderance of evidence that the College's admission to the

sonography program was discriminatory. OCR should explain to me that why they rejected my prima facie case in which I proved that I was rejected from the sonography program while a less qualified white American student was accepted to the program.

85.   OCR Texas kept me waiting for almost two years, while in their manual it says that the recipient had only 14 days to reply to the complainant's appeal letter. What the OCR Texas was doing all those two years and why they kept me waiting for such a long time if my appeal did not represent anything new and in excess to what OCR Atlanta had responded to? They wasted two precious years of my life!

86.   In OCR Atlanta letter of finding page 6 it said "In the appeal, you must explain why you believe the factual information was incomplete or incorrect, the legal analysis was incorrect or the appropriate legal standard was not applied, and how correction of any error(s) would change the outcome of the case; failure to do so may result in dismissal of the appeal." I wrote my appeal letter which presented all the necessary characteristics my appeal needed to survive their dismissal, so it was good enough to stand the dismissal. Actually I showed that the factual information was incorrect, the legal analysis of OCR was incorrect, and that they did not applied the appropriate legal standards and showed how the correction of those errors would change the outcome of the case, all that was necessary to prevent the

dismissal. And I did that by referencing all my allegations to DOJ Title VI manual which I highlighted appropriately and sent them with my appeal letter. Most importantly, I proved my prima facie case with a small piece of information OCR Atlanta had given me that I was only 1.17 points back compared to the 16th and the last accepted applicant who was a white American.

87.   If as Ms Angela Hights, from OCR Texas wrote, the issues raised in my appeal did not warrant a change in OCR disposition of my case under the laws and regulations enforced by OCR, why they did not dismiss my appeal immediately, and kept me waiting for two years? **She should have explained what issues I had raised in my appeal and how the laws and regulations enforced by OCR did not support them,** but she did not explain anything, because she did not have any explanation. I was right and they just wanted to deny my appeal and support the school. They were not impartial; they did not follow the OCR and DOJ instructions. She even could not explain why she was denying my appeal.

88.   What did Mr Thomas Stack from OCR Dallas mean when five months before their rejection email said that the appeal officials were reviewing the response to my appeal "All I am able to report is that a response to your appeal is presently under review by the appeal responding official.  I will forward your concern (this email) to

so inform.  Once OCR has made a final determination on your appeal, you will be notified by email. Tom" ?

89.    I decided to get a lawyer; I could not find a lawyer, because in Georgia no lawyer defends a college admission case that is not related to disability discrimination. Nobody cares for hardworking minority students like me. It is shameful that in Georgia you should be a criminal to deserve to have a lawyer! Or at least **you must be disabled** **to be able** to defend your education right! There was only one lawyer that told me send him my documents for review after which he came back to me and told me his firm was too small to be able to take on my case. That's when I decided to go ahead "as pro se litigant". Since then I was searching the internet to learn about the relevant laws to my case and find the correct laws to support my claims and organizing my facts and cause of actions and preparing my exhibits for proving my claims.

# Count 1

**Violation of Title VI-42 U.S.C. § 2000d and its Implementing Regulations (exhibit 40)  -Intentional Discrimination Claim against Ms Strong, Mr Sass, Ms Rebecca Alexander, Gwinnett Technical College, Mr Dabrowiak, TCSG**

**Similar case: Kawika Smith et al v. Regents of the University of California to stop ACT and SAT tests in its admission process because of their discriminatory effects, which succeeded in May 2021**

**Title VI and its implementing regulation at 34.C.F.R. pt.100.3 (a)**: No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

**Title VI and its implementing regulation at 34.C.F.R. pt.100.3 (b)**: Specific "Discriminatory actions prohibited. (1)A recipient under any program to which this part applies may not, directly or through contractual or other arrangements on ground of race, color, or national origin: (i) deny an individual any service, financial aid, or other benefit provided under the program:(ii)Provide any service, financial aid, or other benefit to an individual which is different, or is provided in a different manner, from that provided to others under the program: (iii) subject an individual to segregation or separated treatment in any matter related to his receipt of any service, financial aid, or other benefit under the program: (iv) Restrict an individual in any way in the enjoyment of any advantage or privilege

enjoyed by others receiving any service, financial aid, or other benefit under the program: (v)<u>Treat an individual differently from others in determining whether he satisfies any admission, enrollment quota, eligibility, membership or other requirement or condition</u> which individuals must meet in order to be provided any service, financial aid, or other benefit provided under the program:

(b) (2) A recipient, in determining the types of services, financial aid, or other benefits which will be provided under any such program, or the class of individuals to whom, or the situations in which, such services, financial aid, other benefits, or facilities will be provided under such program, or the class of individuals to be afforded an opportunity to participate in any such program, <u>may not, directly or through contractual or other arrangements, **utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their** race, color, or **national origin,** or have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respect individuals of a particular race, color , or national origin."</u>

**Title VI and its implementing regulation at 34.C.F.R. pt.100. App. B F.**
IV. ACCESS AND ADMISSION OF STUDENTS TO VOCATIONAL EDUCATION PROGRAMS

## A. RECIPIENT RESPONSIBILITIES

"Criteria controlling student eligibility for admission to vocational education schools, facilities and programs <u>may not unlawfully discriminate on the basis of</u> race, color, <u>national origin</u>, sex, or handicap. **<u>A recipient may not develop, impose, maintain, approve, or implement such discriminatory admissions criteria.</u>"**

## K. ELIGIBILITY BASED ON EVALUATION OF EACH APPLICANT UNDER ADMISSIONS CRITERIA

Recipients may not judge candidates for admission to vocational education programs <u>on the basis of criteria that have the effect of disproportionately excluding persons of a particular race, color, national origin,</u> sex, or handicap. However, if a recipient can demonstrate that such criteria have been validated as essential to participation in a given program and that alternative equally valid criteria that do not have such a disproportionate adverse effect are unavailable, the criteria will be judged nondiscriminatory.

<u>Examples of admissions criteria</u> that must meet this test are past academic performance, record of disciplinary infractions, counselors' approval, teachers' recommendations, interest inventories, high school diplomas and **<u>standardized tests</u>**, such as the Test of Adult Basic Education (TABE).

## L. ELIGIBILITY OF NATIONAL ORIGIN MINORITY PERSONS WITH LIMITED ENGLISH LANGUAGE SKILLS

Recipients may not restrict an applicant's admission to vocational education programs because the applicant, **as a member of a national origin minority with limited English language skills**, cannot participate in and benefit from vocational instruction to the same extent as a student whose primary language is English. It is the responsibility of the recipient to identify such applicants and assess their ability to participate in vocational instruction.

Acceptable methods of identification include:

(1) Identification by administrative staff, teachers, or parents of secondary level students; (2) identification by the student in postsecondary or adult programs; and (3) appropriate diagnostic procedures, if necessary.

Recipients must take steps to open all vocational programs to these national origin minority students. A recipient must demonstrate that a concentration of students with limited English language skills in one or a few programs is not the result of discriminatory limitations upon the opportunities available to such students.


## M. REMEDIAL ACTION IN BEHALF OF PERSONS WITH LIMITED ENGLISH LANGUAGE SKILLS

If the Office for Civil Rights finds that a recipient has denied national origin minority persons admission to a vocational school or program because of their limited English language skills or has assigned students to vocational programs solely on the basis of their limited English language skills, the recipient will be required to submit a remedial plan that insures national origin minority students equal access to vocational education programs.

90.     Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

91.    In May 2017, Ms Strong, Mr Sass, and the College used TEAS exam for selection of the sonography applicants; TEAS exam is 50 %  Reading, and English vocabulary and usage; it is stated in (exhibit 26) that it measures basic skills of reading, math, science, English and language usage.  The usage of TEAS score to measure the students' qualifications for the sonography program was discriminatory for me as a student of minority national origin whose primary language is not English according to **Title VI and its implementing regulation at 34.C.F.R. pt.100.3 (a), (b) and pt. 100, App. B:F, K and specially** (L. ELIGIBILITY OF NATIONAL ORIGIN MINORITY PERSONS WITH LIMITED ENGLISH LANGUAGE SKILLS): "Recipients may not restrict an applicant's admission to vocational education programs because the applicant, **as a member of a national**

**origin minority with limited English language skills**, cannot participate in and benefit from vocational instruction to the same extent as a student whose primary language is English" . It had an adverse effect on my total score because of my English language and usage score of 79.2%, and my Reading score which was 80.9% vs. my Math 100%, and my science 85.1% (exhibit 27).

92.   I was rejected unjustly because I did not score in my English parts of TEAS exam as high as white American students, and also because of **the College's change of criteria for GPA points after the submission of applications that made GPA 4.0 worthless.** The College evaluated the applicants practically only based on their TEAS scores and the applicants were accepted to the program because of their higher TEAS scores. Especially, Ms Strong changed the GPA points by trial and error in her excel spreadsheet to make sure that I was not among accepted applicants or alternative list of applicants, as her behavior toward me in sonography lab encounter and her suggestion to me to choose radiology program instead of sonography were obvious evidence of her dislike toward me and that she did not want to see me in her class. She adjusted GPA points to make sure I was just behind the last alternative applicant.

93.   I want to emphasize here that the College changed their announced criteria and gave TEAS exam the dominance over other categories including GPA **after the**

**applications were submitted** and without the applicants' knowledge. In their announcement TEAS had 30 points and GPA had 40 points, therefore TEAS had 10 points less than GPA. **After submission of the applications they gave TEAS 30 points, but they gave only 12 points to GPA.** The exaggeration of points assigned to the discriminatory category TEAS, 30 points, vs. 12 points for GPA according to their post hoc, behind the scenes point assignment for GPA caused my rejection from the program.

94.   In the announcements of the College prior to submission of the applications the GPA had 40 points vs. 30 points of TEAS, but the College changed it without our knowledge behind the scenes to accomplish their systemic discriminatory pattern and practice which was going on for years in the sonography department.

95.   TEAS exam score does not prove that I was not qualified for the sonography program because I already had achieved the highest scores above all my classmates in the same college for the prerequisite courses of the sonogrphy program with an A+GPA. Besides, in their catalogue for Associate degree of sonography (exhibit13) they wrote: "The profession requires <u>critical thinking skills</u>, <u>judgment</u>, and the <u>ability to provide appropriate health care services</u>." However, it does not mention anything about English language and usage, or Reading skills, those two skills that are emphasized in TEAS exam and consist 50% of the exam score. **Also, there are**

**no English courses directly or indirectly related to Reading or Usage of English language among the 61 credits of sonography Associate Degree courses either!**

96. What's more in their catalogue for Medical sonosgraphy Certificate they wrote: "The healthcare science pre-diagnostic Medical **sonography certificate provides students with general education courses that serve as a foundation for further study in the degree level** diagnostic medical sonography program. The fact that the College itself declares that the certificate level courses serve as a foundation for the further study in degree level contradicts with the Colleges' later strategy, after submission of the applications, of deciding TEAS to be the main factor in the selection of the students.

97. Also the College's report for the retention rate of the sonography program for 2022 so far shows that 5 out of the 16 initially selected students have already withdrawn, which is 31.3%. The College emphasizes on TEAS exam score for the selection of the successful prospect students and gives it more than 2.58 times the value of GPA, though the retention rate proves it baseless and proves that the College has no legitimate reason for putting such a high reliance on TEAS scores. The College chose TEAS over GPA **after the submission of the applications** because of their discriminatory pattern and practice of systemic discrimination in their sonography program of selecting at least 80% of their sonography students

from white American students; because white American students scored high in TEAS but they did not have a high enough GPA.

98. In their invitation letter the College sent me for registering in the certificate program in June 2016 (exhibit 9) they wrote that I was accepted for admission to their certificate program and that **"All Health program applicants will be placed in the Healthcare Assistant or Healthcare Science Certificate program in preparation for the competitive health program selection process."** Therefore, I registered in their certificate program, because the College was supposed to prepare me for the competitive selection process.

99. After I finished the certificate level with an A+ GPA they rejected me from the Sonography competitive selection. I did all my obligations excellently, therefore if they found me not prepared, it was not my fault and they did not teach me what I needed. They rejected me from competitive selection based on a test which they slipped in 3 months before the application deadline 50% of which was English language proficiency test. Besides, they changed the GPA point assignment **after the submission of the applications** to defeat me and accept other less qualified students among them the white American student which was ranked number 16, otherwise I was ahead of her as proved in my prima facie case.

100. The certificate level as they said "… is a degree level certificate. (Program Length: 3 Semesters **Minimum**)". In their catalogue they said that the certificate level which took me four semesters and I paid about  $4,000 for it and finished with A+ was a foundation for further study in the degree level; however, in their final selection they relied only on TEAS scores and disregarded GPA of those foundation courses.

101. They assigned only 12 points difference between the lowest and highest possible GPAs, instead of 40 points difference that the College had announced in their "Applicant Admission Check List" (exhibit 1), also Ms Strong equated GPA 3.751 to GPA 4.0 and so on. It means she put no distinction between a student with GPA 3.751 and a student with GPA 4.0, whereas in her table for TEAS she had considered even hundredth difference between the applicants' TEAS points! Such an obvious hypocrisy between point assignments for two similar categories is the proof of her discriminatory intention; exaggeration of an exam that only measures the basic skills mostly English reading and usage vs. GPA which was the real test of our ability to learn and pass "the foundation courses" was the obvious proof of the College's discriminatory intent for accepting more white American students. What's more, changing the GPA points behind the scenes was illegal and unlawful.

102.  To show how TEAS's language and usage part questions were not at all reliable in measuring success in sonography degree program, I am presenting (exhibit 39) which shows the test questions testing the knowledge of difficult and unpopular words which a sonographer would never use during her career, and how a wrong answer to 5 of those questioned had brought done my score to 79.2.

103.  Even after my complaint and seeing how their unlawful acts had defeated me, the College insisted that I was not qualified and that I should choose other programs that may be available for me and use the lesson I had learnt from that experience! She had intentionally compressed the gap between the students' GPAs in two manipulative ways, which left GPA almost with no effect in her selection process, and all the students with the highest TEAS scores were selected for the program, regardless of their GPA. I have shown the correct point assignment for GPA which is according to the announcement of the College and consistent with the point assignment for TEAS and other categories in (table 3 of exhibit 19) with more explanation of the point assignment in (exhibits 20, 21 &28)

104.  They registered me in their certificate level, got my money, and I was an excellent student; then they rejected me and accepted white American students even from other colleges such as Athens Technical College less qualified than me. The combination of discriminatory criteria TEAS as testing the English proficiency and

the manipulation of GPA points and rendering GPA 4.0 worthless on behalf of TEAS, had adverse effect on my total sum of points and despite my higher qualifications on the basis of preparedness for the sonography degree program compared to other students with only higher TEAS score, caused my rejection. The adverse effect on my total points is proved in (exhibit 25) through the bank account example and my prima facie case in this letter and also in (exhibit 32).

105.    TEAS, besides being mostly a test of English reading and usage is also a strictly timed exam causing a lot of anxiety and stress, for example we had only 64 minutes to read about 18 pages (from page 177 to 194 on ATI TEAS Mometrix test preparation) including 53 multiple questions, to think, analyze and answer.

106.    As to the concern of the College about my learning abilities for success, the College had already tested my ability to take courses related to my program of study, sonography in 2016 when I took the "COMPASS" test in the assessment center of Gwinnett Tech. The results were all 95 or above (exhibit30). In my Compass exam result page it is clearly mentioned that my Major was Diganostic Medical Sonography Degree, and it says "you may register for degree-level courses ..." If the College thought I was not qualified for degree-level courses or I had deficiency in my English understanding they should have told me and should have helped me to get ready then not **after more than four semesters and spending**

**almost $4,000 and after I got a GPA of A+ they discovered that I was not academically prepared enough and rejected me.**

107.   The best evidence of my preparedness and qualification was my A+ GPA from their own college. But they turned their back to the GPA that I earned in their own college on behalf of just a 4 hours exam of basic skills of mostly English; therefore **the quality was not what they were looking for and they just pursued their discriminatory intent.**   Even Ms Tavia Thurmond, the program support specialist told me that I was too close to those accepted, and thought talking with Ms Strong would help me.

108.   TEAS was so loudly promoted in the College that I remember when I was submitting my application package to the enrollment advisor and told her that My GPA was A+, she told me that I should not hold my hopes too high because there were a lot of students with very high TEAS scores in 90s. But nobody cared for my A+ GPA, although GPA was supposed to have 40 points, 10 points more than TEAS which had 30 points; the advisors already knew the College's agenda that they were only looking at TEAS scores for selection, but I did not know that at the time of submitting my application.

109.   What is making TEAS results even less reliable is that there are a lot of companies on the internet that do take the exam instead of the students (exhibit 31)

and even guarantee to send their money back in case the satisfactory result was not achieved. Therefore, again the financially privileged students are in an advantage for a higher TEAS score.

110. If I know about these companies, then Gwinnett Technical College also knows about them; they do have the responsibility to know about them, after all. Anyway, I sent an email to Mr Dabrowiak in TCSG a few weeks ago and let him know about the widespread cheating, and he said that the colleges are free to use any selection criteria as long as it is non-subjective and that I should talk to my college. Nonetheless, they are pushing students towards dishonesty and cheating by putting all the weight for selection of the students on one exam of 4 hours, while the GPA was gained during four semester after so many exams after exams, weekly, monthly, midterm, and final exams with very little chance of cheating; at least there is a very little chance that a student can cheat successfully in all her exams and get an A+ in all of them. The emphasis the College has put in using TEAS as the main criteria for applicants administrations violates the above mentioned regulatory instructions set forth by Department of Justice for prohibiting discrimination. What's more the College did not announce their intention before applications were submitted and pretended to give the GPA the highest points and the highest importance!

111.   The College cruelly rejected me again after my complaint and explaining how their change of criteria **after submission of the applications** on behalf of the points assigned to TEAS and their emphasis on TEAS defeated me who was an A+ student of their own college. They did not double check on my qualifications which was what they should have done if they did not have any premeditated plan for selection of their desired pool of students and my rejection! After all, how many students like me they had in the certificate level of the sonography program with a GPA of A+? Besides, I had a bachelor degree in physics and sonography is based on sound waves which is physics. I was maybe the only student who had these credentials, but they callously rejected me. It should have been counted as a plus for me, just like healthcare experience gave students who had worked in medical field points toward their application. This looks very strange, unless there is an intention.

a)      **Circumstantial evidence –Proof of Intentional Discrimination- The sequence of events leading up to the decision, as compared to other decision to comparable matters;**

112.   TEAS exam and essay points were slipped in by the College in lieu of the leverage of Interview they used in selecting their desired pool of the applicants in

previous years. When TCSG considered the interview too subjective and warned the college against using it, the College was banned from using interview as their selection tool; they compensated the freedom they needed in the selection process by a combination of 1)TEAS exam, 2)Essay which they had primarily given it 20 points and after my complaint over my 5.5 point from 20 point, the Vice president of academic affairs covered up the issue by changing the announced 20 points to 8 points; she said it was 8 points not 20 points without further explanation, 3)the manipulation for GPA point assignment lowering the GPA value from 40 points to 12 points value by changing the GPA point assignment from what they had announced prior to the submission of applications and despite what they had promised.

113.   Even in the previous year criteria GPA points assignment was announced as GPA points=GPA×10 which they abandoned because it was not helping them to reject me and select the less qualified white American applicants among them applicant number 16. I have proved in my prima facie case that if Ms Strong had used the previous year point assignment for GPA, I would be 0.83 points ahead of the last applicant, i.e. the student number 16.  The College needed a drastic change which <u>Ms Strong invented by defining a scale for GPA in a table which had only 6 rows in contrast with the detailed table of points for TEAS which had 36 rows</u>

which considered TEAS point differences as small as a hundredth point! In contrast, she equated GPA3.751 to GPA 4.0 and gave them both 40 points, which was a slap on the face of 4.0 students; she also compressed the gap between GPA 2.5 and GPA 4.0 and made only 6 rows (exhibit 2) in between and therefore only 6 different possible values for GPA points as 28, 32, 34, 36, 38, and 40 starting from 28 instead of starting from zero which made the difference from the highest to the lowest points 40-28= 12 instead of 40points, vs. 36 different values of TEAS starting from zero and ending to 30 (exhibit 3). Even the intervals between the defined points that should be the same are different; from 28 to 32 there is 4 points, and then the interval changes to 2 points between 32, 34, 36, 38, and 40. That table of GPA with only six rows was not in accordance with the 40 points value of GPA vs. 30 points of TEAS that the College had promised us.  The correct point assignment for GPA has 40 rows starting from 0 to 40 points assigned to GPA 2.5 to GPA 4.0 (exhibit 19, table 3) just like the table for TEAS in (exhibit 3).

114.   What adds to the discriminatory nature of TEAS exam is that it was allowed to be taken twice, first attempt for $50 (currently $107), and second attempt $75(currently unknown) with an interval of one month. TEAS score was added to the criteria on February 2017 only three months before the application deadline. The publisher itself mentions on its website that at least 6 weeks study is needed before

taking the test in order to be prepared enough to pass it; the passing score for Gwinnett Tech was 70. But that 6 weeks time needed was only for passing the exam; now imagine how much time a typical student may need to score in upper 90s. The students who were rejected from the previous years' application had plenty of time to prepare for TEAS despite me that was my first application. Test taking practice material were available online and cost a lot; at that time I remember there were two tests each almost $48. I had already put more than $1,000 on our credit cards for spring semester, and later had to register in my summer semester for those other required courses before the start of the program, almost another $1,000. They got more than $150 for instruction and advice from their enrollment dept., which did not even provide us with the transparent criteria for our program application!

115. In the lawsuit of **Kawika Smith v. Regents of the University of California** the same inequalities that I have mentioned in my case are discussed and analyzed as adversely affecting the result of standardized tests, such as the disadvantage of national origin minority students whose primary language is not English, having financial disadvantage in buying materials for test preparation, or having parents with low level of education who cannot help or give any advice.

116. On Law360 website in an article named **"Winston & Strawn Aids UC Students In Test Score Case"** By Rachel Rippetoe | June 20, 2021, 8:02 PM

**EDT. , says:** "When Kawika Smith was a senior at Verbum Dei High School in South Central Los Angeles, he watched as his peers took $1,000 summer prep courses for the SAT, learned the tricks to scoring higher on the standardized test, and then aced it, knowing they had unlocked a key to nearly all the colleges in the University of California system."

117.     Kawika who did not grow up with money and had anxiety of taking exam stated his opinion so beautifully about those standardized tests: "It kind of frustrated me, knowing that it wasn't reflective of what you were taught in your classroom at your particular school," he said. "Instead, it was based on how well you knew how to play the game. And I didn't want to play anyone's game."

118.   In the same article it says: **"The SAT and the ACT essentially acted as proxies for preexisting privilege, proxies for race and socioeconomic advantage and for lack of disability accommodation,"** said Katherine Farkas, one of the Winston & Strawn lawyers who represented the students. **"These tests ended up becoming gatekeepers that prevented public education from serving its real purpose."**

119.   In another article named: "Smith v. Regents settlement bars use of SAT, Act until 2025" on dailycal.org website about the same lawsuit written by Veronica Roseborough and published on May 19, 2021, as a statement by Amanda

Mangaser Savage, a staff attorney with the Opportunity Under Law project at Public Counsel, a law firm representing some Smith plaintiffs, says: **"The settlement really raises the stakes immensely, not just for universities in California, but for universities across the country,"** Savage said. **"Given what research has clearly demonstrated about the SAT and ACT, that because they're proxies for wealth and race rather than a student's ability to succeed in college, what justification other than entrenching existing privilege does any university have for continuing to rely on these discriminatory metrics."**

120.   Today the ATI website is full of costly test preparation material. The money that should be spent in order to get a higher score for TEAS causes great disparity between the scores of wealthy white American students and students like me, who barely meet their essential needs in life. **I could not afford to buy any test preparation material or take the test twice. My score was 86% in my first and only TEAS exam I took.**

121.   There is no proof that students who scored higher in TEAS were more knowledgeable or more qualified. As explained by ATI itself it is a measure of how much additional preparation a student may need when admitted to the program that is the same for both the "advanced" and "exemplary" classifications. (**exhibit 34**) .

As it can be seen  TEAS scores of 78-90 are ranked as "advanced"  in one category, and scores from 90.7-100 are ranked as "exemplary" in one category.

122.    Ms Strong used double standards for TEAS and GPA point assignment. Ms Strong didn't elevate my points to the upper limit point of my group for TEAS score, i.e. 89, like she did for the lower GPAs. She defined GPA 3.751= GPA 4.0. Why this double standard for TEAS and GPA? If she had given me 89 points for my TEAS, I would have been accepted in the program before the student number 16 and also before a few more students. I would get the same points from TEAS as the 16th student with the TEAS score of 88 or 89.

123.    Therefore as it is obvious the College, Mr Sass, and Ms Strong engineered everything for their discriminatory purpose. She could have followed the instructions of the Publisher of the Test, but she didn't. If her invented point table for GPA was done so innocently, then why the scenario was different when dealing with TEAS? **Their favor towards TEAS scores without any legitimate reason on why TEAS is a more accurate and essential qualification indication than GPA shows their intention of discrimination. What's more their changing of criteria after submission of the applications was illegal.**

## b) **Proof of intentional discrimination- Prima facie case-** Page 64/138 DOJ manual

124.  "Plaintiff must first prove a prima facie case of discrimination by a preponderance of the evidence.

"…A) plaintiff typically shows that he or she is a member of a particular protected group

B) was eligible for the recipient's program, activity or service

C) and was not accepted into that program or otherwise treated in an adverse manner

D) and that an individual who was similarly situated with respect to qualifications, but was not in the plaintiff's protected group was given better treatment."

125.  The complete proof of my prima facie case and that I was more qualified than the applicant number 16 is also in (exhibit 32). I was a minority national origin student. I was eligible for the College's sonography degree program and applied successfully to the program but was not accepted in the program despite having higher qualification than some of those accepted. I was treated in an adverse manner by Ms Strong, Mr Sass, Ms Alexander, and the College and was rejected, because of Ms Strong's manipulation in evaluating GPA by creating a table for GPA points **after the applications were submitted,** that made GPA 4.0 worthless on behalf of their discriminatory criteria of TEAS exam. That GPA point assignment table

(exhibit 2) was different from their announced criteria (exhibit 1), and furthermore not consistent with the point evaluation she did for other categories including TEAS. Ms Strong awarded extra points to the GPA of the applicant number 16 who was white American with lower qualifications and therefore elevated her sum of points above mine and made her to be accepted instead of me. This act of accepting less qualified students (at least one student) instead of me was evident of their discriminatory intention of accepting the white American student instead of me.

126.   Ms Strong already had shown that she did not like me in my first session of playing as a patient in their sonography lab. Ms Caldwell threatened me that I could not be accepted in the program and after that Ms Strong came and talked to me in a very condescending way by telling me "that was none of your business". She intimidated and harassed me by sitting opposite to where I lied on the bed to be scanned and by blaming and ridiculing me. Of course she did not like me and she did not want to see me in her classes. She went to extreme where her intervention was not at all necessary in that incident in the lab. She showed to me how serious she was in her hatred; she could not control herself. In that lab incident where her intervention was not at all necessary she showed me that I was not welcome to her program! She personally signed me off from the sonography lab in my first session

to learn my name for her future intentions. I was very simple to think that I could enter the program just because I had high qualifications.

127.   As OCR Atlanta told me the student number 16 who was the last accepted applicant and was white American was only 1.17 points ahead of me. If Ms Strong had not put all the emphasis on the discriminatory TEAS exam and had not unlawfully changed the point assignment for GPA **after submission of the applications** by awarding extra points to the GPA of all applicants except the 4.0 GPA, my total points would suffice to beat not only applicant number 16 but also so many of those ahead of her. According to the 40 point scale for GPA, from 2.5 to 4.0 (exhibit 19, 20, 21, 28), which was announced by the College in 2017(exhibit 1), I would be 38-29.33+1.17= 7.5 points ahead of the student number 16. Because that student's points from her GPA would be only 29.33 in a 40 point GPA scale instead of 38 points from the post hoc criteria for GPA points (exhibit 2). If I show my total sum of points with R, and the 16th student's Real sum of points with S(real), and her sum of points awarded by Ms Strong as S, then according to OCR: S=R+1.17, student 16th was 1.17 point ahead of me; since her GPA was given 38-29.33= 8.67 points extra, then: S= S(real)+8.67= R+1.17 ; S(real) = R-8.67+1.17 ; S(real) = R-7.50; which is the proof that I would have 7.5 points more than the 16th student. Ms Strong used her excel spreadsheet as an excellent tool to help her manipulate the

point assignment table for GPA after the submission of the applications; she entered the applicants' points from different categories into the spreadsheet and sorted the sums to see which students were listed on the first sixteen rows. She then changed the GPA point assignment table with trial and error (It is apparent that this table has been achieved by trial and error; it does not follow any rule or formula) until the sum of the applicant points were changed in a way that the first 16 applicants and the alternative applicants appearing on the first 24 rows of her excel spreadsheet were those she was looking for. It is not surprising that I was listed as applicant number 25 exactly after the last alternative applicant. Ms Strong and the College's discriminatory intention made them to create the illegitimate criteria for GPA points **after the submission of the applications** (exhibit 2), which caused the white American applicants with lower qualification including applicant number 16 to get ahead of me.

128.    Ms Strong hated me and did not want to see me in her class! **Mr Sass told me in my face that he wanted to give me a Zero.** They all hated the fact that I was highly qualified. He threw me out of the College! He called police on me and threw me out of the College; because he was afraid I would get more information and would prove their conspiracy for my rejection. He thought by throwing me out of the College he could hide the truth forever.

129.   In previous years, the College had again assigned 40 points to GPA and calculated points for GPA according to the formula: **points for GPA= GPA×10** (exhibit 33). Therefore, there would be 25 points for GPA 2.5 (minimum allowed GPA), and 40 points for GPA 4.0.  According to the information that OCR Atlanta gave me in their letter of findings, I was only 1.17 points behind the last accepted applicant, who was number 16 on the excel spreadsheet.

130.   When the College and Ms Strong tried the above point assignment for GPA on their excel spreadsheet, i.e. Points for GPA= GPA×10, and sorted the sum of the applicants' scores on their excel spreadsheet, my name came ahead of the applicant number 16, because that student's GPA points was 3.6×10=36 two points less than 38(exhibit 2) that Ms Strong gave her. Therefore, the applicant number 16 would have had 2 points less than what she got in the selection process, and instead of her being 1.17 points ahead of me, I would have been 2-1.17=0.83 point ahead of her; therefore I would have been selected instead of her. In order to shift the result of the selection toward their discriminatory intention which included the selection of that white American student instead of me, the College, Mr Sass, Ms Strong, and Ms Alexander decided to elevate the GPA point value for applicants except me with GPA 4.0. My GPA points stayed the same which was 40, but GPA point of

applicant number 16 was increased by two points and became 38(exhibit 2) instead of 36, hence she won over me by1.17 points.

131.   I was not just ahead of that student, but ahead of more students, but since I just have the point difference between me and her, that's why I am limiting my proof to being ahead of student number 16.

132.   If I show my sum of points by R for Roobina and that student's sum of points after being awarded extra points by S and her real sum of points by S(real) when the 2016 criteria for GPA was used then: S=R +1.17 as per OCR information; but since Ms Strong had added two points to that students GPA points therefore: S=S(real)+2= R+1.17; S(real)= R-2+1.17; S(real)=R- 0.83, therefore the 16th student's real points sum would be 0.83 lower than mine

133.   From DOJ manual (page 66/138) for Title VI as circumstantial evidence for the proof of intentional discrimination **"the defendant acted contrary to a written policy setting forth the action the defendant should have taken under the circumstances;"** The College's change of their written and announced criteria for GPA points after submission of the applications was the apparent proof of their intentional discrimination according to DOJ Title VI manual.

134.   Ms Strong's departure from the previous year's procedure is another evidence for her intentional discrimination. As "departure from the normal procedures or substantive conclusions" is considered by DOJ as a circumstantial evidence for intentional discrimination. (page58/138 of DOJ Title VI manual). Ms Strong had to create that illegitimate table for assignment of points to GPA, because if she had used the table of 2016, I would have been accepted instead of applicant number 16 by 0.83 point difference. On the other hand if Ms Strong had used the 2017 announced criteria for GPA point assignment, again I would have been accepted by 7.5 point difference. Therefore she invented the GPA points table (exhibit 2) **after submission of the applications**, which also did not follow any normal procedures that she used for other categories or in previous years, in order to reject me.

135.   OCR said that only 16 applicants plus I from total of 81 applicants had GPA of 4.0, but Ms Strong had elevated the GPA of 35 more students to 4.0. OCR did not mention how many of those top 16 selected students were white American? How many of those top 16 had a GPA of 4.0? How many of the GPA 4.0 students had been rejected who was not white American? How many of those 16 top ranked students had the highest TEAS scores among all the applicants? I will need this information and some other data to present as further evidence and proof of

<u>disproportionate adverse effect in the trial.</u> Although OCR mentioned all the other averages for these top 16 people like TEAS average score and Essay average score, they intentionally did not mention their GPA average score even after I asked them directly. They tried to cover up for the College. This is important because I have been discriminated against all of those students who had a GPA lower than 4.0 but got extra points for their GPA points and got ahead of me and were accepted to the program.

## Proof of Intention – prima facie case- Illegitimate, discriminatory criteria that does not prove qualification

136.   Ms Strong, Mr Sass, and the College do not have any legitimate reason that why the student in rank 16 was more qualified than me, other than that her sum of points was 1.17 more than mine; points that she was given by that wrong and unjust point assignments, because **Ms Strong created that GPA point table after submission of the applications**, which was neutral in face and as the College said same for all the applicants <u>but apparently it did not award me any extra points for my GPA</u>, as an after fact criteria to allow them to discriminate against me with 4.0 GPA and with higher qualifications. <u>The College should prove with a legitimate</u>

reason why the applicant number 16 was more qualified than me (DOJ manual page 66/138).

137. Specially that we can see in the Gwinnett Technical College sonography program retention report for 2022 (exhibit 29), to this point they have 5 out of 16 initially selected students withdrawn from the program, and the retention rate is as low as 68%! If the College claims that their discriminatory selection process is very helpful and they insist on continuing their discriminatory selection process for choosing the successful applicants in their competitive selection process, then they should be able to show that their prediction of the students' success based on their TEAS scores was right and legitimate. But so far the numbers prove otherwise.

138. They did not use TEAS to choose the most qualified students as they claim. Their methods of point assignment for other criteria are a proof that they were not pursuing the most qualified applicants; in her self-made table for GPA points they did not consider students qualifications and they gifted extra points to lower GPAs; the only GPAs that did not get extra points were 4.0 GPAs. In assigning those 3 points for completed all prerequisite courses they did not consider the grade for those courses, also in other courses of ALHS they did not consider the grade for those courses. All the points were given quantitatively, except for TEAS which was their discriminatory tool for which they considered even hundredth point difference!

Whereas if they cared for quality, they should have considered what our grades were for all those courses. They exaggerated the point gaps for TEAS, which lead them to their discriminatory intentions.

139.   I want to remind that students were also provided with companies to take the TEAS exam for them that add to the controversy of TEAS as being such a good measure of qualification as the College insists. I was doing some online research when to my surprise I came into a website named www.takemyteasexam.com . This is just one of those numerous companies out there doing business by taking students' online exams or even the complete online classes for them! https://domyexams.com is another one of those companies. It is hard to believe that ATI TEAS or colleges that use TEAS exam are not aware of these companies. It is sad and shameful that the College and TCSG are promoting the spirit of cheating in our colleges and universities.

### c)       Circumstantial evidence -Proof of intention -Derogatory comments and confrontations

140.   Although the College has policies that strictly prohibit harassment, misconduct, intimidation, retaliation, etc, in each of the following incidents which I reported to them and TCSG, none of them followed up with what had happened in

the incidents, and did not arrange for any investigation. <u>This is another proof that they did not respect me as their student, and did not respect their promises in their policies and did not follow their procedures.</u> In none of the following incidents the persons who harassed, intimidated me, ridiculed me, or called police on me were justified for their behavior toward me. I had done nothing wrong to deserve such behavior. This by itself shows that the College supported, backed up, and encouraged their employees' misconduct and discriminatory behavior. It shows that the college did not care for me, my emotions, or even for following their own policies and procedures.

141.    The Sonography lab supervisor threatened me that I could not be accepted in the program if I did not follow her orders when I was there as a **"volunteer"** to accomplish the first of my six hours playing patient in their lab.

142.    On my first day of appearing as **"volunteer"** in their sonography lab Ms Strong came to me and aggressively blamed me for the above incident with her associate and made a big deal of it. Maybe she was afraid that I would report what her hired personnel had told me about rejecting me from the program. She talked to me very disrespectfully and said with a smirk on her face "It was none of your business...." **<u>Ms Strong showed how strong her hatred was toward me</u>** when she <u>looked into my eyes with a smirk on her face and spoke those words "it was none of</u>

your business", while it was not necessary for her at all to come to me and interrupt the student who was scanning me. I had not done anything wrong to need to be disciplined. She harassed me and intimidated me with no reason. I will never forget the look she had on her face when she was talking to me. And I cannot understand why she allowed herself to talk to me like that?! Ms Strong did not want to see me in her classes; therefore **she intentionally and unlawfully manipulated the point assignment for GPA after submission of the applications** which gave the student number 16 the extra points to make her points 1.17 more than mine when she saw I was ahead of her in her excel spreadsheet. I was not just ahead of that student, but ahead of more students, but since I just have the point difference between me and her that's why I am limiting my proof to being ahead of student number 16.

143. Mr Sass intimidated me in the meeting I had with him on June 15, 2017 that he would have given my essay Zero if he was in the place of Ms Strong, without any good reason, and knowing that I was an A+ student. What can make an impartial instructor talk so harshly other than hatred? He did not even know me. The intention of discrimination is apparent in his behavior. I had not done anything to him, he was determined to reject me from the program and he would have given me zero if he had to in order to reject me as he himself admitted. But when I did tell about the

incident to TCSG and the College, they ignored me. This shows that they encouraged his behavior toward me.

144.   On July 11, 2017 when I was in Ms Tavia Thurmond's room to get some input about my point status in my application relevant to other applicants according to her invitation in my rejection email; suddenly Mr Sass intruded into the room, shouted at me and Ms Thurmond, ordered Ms Thurmond not to talk with me and told me I did not have any right to go back to school and ask questions about my application status and I should have waited for the answer to my complaint. He threatened me to call the police to throw me out of the College and he did call the police. I was with my husband; he told me not to resist and go out. When we came out of the building 200 the police was standing by his car ready to come in to throw us out. My husband and I felt very bad, extremely humiliated, oppressed, angry and embarrassed. Although, retaliation is strictly forbidden by DOJ and warrants the harshest confrontation from the College and TCSG towards Mr Sass, the College and TCSG ignored what Mr Sass had done or said.

145.   The discriminatory agenda of the College and their employees in their sonography program, a high prestige and lucrative program of study, had been going on for years and caused 80-90 percent of white American students acceptance and rejection of minority students like me. All those encounters mentioned above would

not have happened if the employees and the College were committed to their policies of respecting the students, honesty, freedom of speech, diversity, and prohibiting harassment, intimidation, and retaliatory conduct and acted in accordance to their procedures to investigate and discipline those violating the policies. Even after reporting those incidents, the College did not make any effort to show their commitment to any of their above mentioned policies. Yet they claim "We say what we mean!"

### d) Circumstantial evidence- Proof of intention- History of discrimination

**Title VI and its implementing regulation at 34.C.F.R. pt.100. App.B**

IV. Access and Admission of Students to Vocational Education Programs

**"B**. SITE SELECTION FOR VOCATIONAL SCHOOLS

"State and local recipients **may not select or approve a site** for a vocational education facility for the purpose or with the effect of excluding, segregating, or otherwise discriminating against students on the basis of race, color, or national origin. <u>Recipients must locate vocational education</u> <u>facilities at sites that are</u> **<u>readily accessible to both nonminority and minority communities</u>**<u>, and that do not tend to identify the facility or program as intended for nonminority or minority students.</u>"

146.   Gwinnett Tech decided to build their second campus in 2014 in Alpharetta in North Fulton County which is one of the most affluent cities and counties in Georgia. Four of the wealthiest cities of GA, Alpharetta, Milton, Johns Creek, and Roswell are in North Fulton County. White Americans make up almost 60% of Johns Creek, 64% of Alpharetta, 74% of Milton and 75% of Roswell populations, with average 11% African American population. Gwinnett Tech is a public school and is mostly funded by taxpayers' money. There are so many deprived cities in GA that could take advantage of this college. The new campus was built in a County in GA, where families are so rich that they live in million dollar houses and can afford to send their children to the most expensive colleges and universities wherever they wish. **Who are these Regents? Who are these trusties? Who is the Board of education? They are spending our money for themselves and for their children and for the children of the Wealthy and implement discriminatory criteria in the colleges and universities to keep hardworking, poor students like me away from education especially the ones with high pays and better conditions, away from my right to equal opportunities?** They do not want to understand the situation, the pain, and inequality we minority students encounter.

147.   We minority students study in conditions hundred times worse and inferior than their children's but they are still cheating at the end by lowering the bar on their

80

<u>children and bringing the bar higher for us by slipping in a test like TEAS that tests mostly English fluency and then even do not get satisfied with it and they render GPA worthless by designing the criteria on behalf of TEAS even behind the scenes!</u> They did not decide in good faith where to build Gwinnett tech campus. If they wanted diversity they would have built the school in a more diverse and underserved district. **In the same way they did not decide in good faith for the selection criteria in the colleges and universities. They use standardized tests and other tools as their gate keeping tools! And still not satisfied, even cheat by changing the criteria after submission of the applications and do not respect what they had promised as admission criteria.**

### e)  Circumstantial evidence-Proof of Intention-History of discrimination

148.  In 2017 Gwinnett Tech was forbidden to select the students for their sonography program based on **interview** by the Technical College System of Georgia (TCSG), because they said it was too subjective! It must have been for the unlawful discriminatory effect that interview created, especially that the College, Mr Sass, and Ms Strong gave 48 points of the total 98 points to the interview and had mentioned that "**Final Applicant Selection is based on Interview Scores**" (exhibit 33) – Loud and Clear. She gave 48 points to interview while giving GPA 40 points

according to the formula: possible points for GPA= GPA×10, and some 10 points to other categories.

149.   A student with GPA 4.0 could get maximum 40 points for GPA. Let's say she would get the other 10 points from miscellaneous categories too, summing up her points to 50. Ms Strong could easily reject the best students through interview! She had 48 points to award and she could award that 48 points to a student with a 2.5 GPA (the lowest that could apply to the program) and make their total points 25+48=73. She could also decide to give 30 points from interview to the GPA 4.0 student making her total points 70! Therefore, the student with GPA 2.5 would be accepted, because Ms Strong decided that special student was more qualified even if their academic evaluation showed otherwise! We had heard that a lot of minority students with GPA 4.0 were rejected in past years and the 80-90 percent white American population is a proof of the College's discriminatory intentions during all those past years. Why should the Interview be given 48 points and be the dominant factor in selection anyway if there is no intentional discriminatory agenda in place?!

### f)   Circumstantial evidence- Proof of intention- History of Discrimination

**Title VI and its implementing regulation at 34.C.F.R. pt.100. App. B:**

## H. ELIGIBILITY FOR ADMISSION TO VOCATIONAL EDUCATION CENTERS, BRANCHES OR ANNEXES BASED UPON STUDENT OPTION

"A vocational education center, branch or annex, open to all students in a service area and predominantly enrolling minority students or students of one race, national origin or sex, **will be presumed unlawfully segregated if:**

(1) It was established by a recipient for members of one race, national origin or sex; or (2) **it has since its construction been attended primarily by members of one race, national origin or sex; or (3) most of its program offerings have traditionally been selected predominantly by members of one race, national origin or sex."**

150.   Their students in sonography program have always been 80- 90% white Americans (exhibit 41& 42). As if we minorities have learning disabilities and only those white Americans deserve to sit behind the sonography machines, as they show on their website, a white girl scanning (exhibit 35) another white student, or (exhibit 36) showing a white American girl with the sonography probe in one hand and a sonogram of an embryo in her other hand. I remember many of my African American classmates were so hopeless and despaired about the selection outcomes of the sonography program year after year that they changed their mind about applying to the program completely and said they would try to pursue something

else, which was actually the aim of the College. As Ms Alexander in her response letter wrote to me (exhibit 8 –page 2): " I encourage you to meet with your program advisor regarding <u>other program options that may be available to you</u> and to <u>continue forward with what you have learned from this experience</u>." Ms Alexander was encouraging me to think about other program options and not sonography! And, I did not understand what she meant by learning from that experience? What I had learnt from that experience? That I could not defeat the College in their cheating and systemic discrimination?

151.   From Gwinnett Technical College frequently asked questions: "What is the current average salary? According to the 2019 Society of Diagnostic Medical Sonography Survey and the U.S. Department of Labor Statistics, salaries averaged $74,320 ($35.25/hour) which includes all levels of experience." This is one big incentive and lucrative salary for a 2- year degree! It can be a good incentive for discrimination, too!

152.   As in their catalogue they say: "We embrace **diversity**." In all these years there was no concern about almost all-white American student population of the sonography department either from the College or from TCSG. Even when I brought the issue to their attention, and send them the graduation photos that showed

8 out of 10 students were white Americans, they did not see anything wrong with their students' diversity!

**Title VI and its implementing regulation at 34.C.F.R. pt.100.  App. B:**

C. STUDENT RECRUITMENT ACTIVITIES

"… students to whom the presentation is made. Also, to the extent possible, recruiting teams should include persons of different races, national origins, sexes, and handicaps."

153.   In the 2017 selection process, Ms Strong alone was doing the selection of the students for sonography program.

E. PROMOTIONAL ACTIVITIES

"Materials that are part of promotional efforts may not create or perpetuate stereotypes through text or illustration."

154.   On their website (exhibit 35) for sonography program they have a white girl sitting behind the sonography machine and another white sonography student lying down on the bed and being scanned by the first one. In (exhibit 36) it is showing a white girl with the sonography probe in one hand and a sonogram of an embryo in

her other hand. On their facebook page there are the students and graduates photos that are more than 80% white Americans.

### g)    Circumstantial evidence- Proof of intention- **Foreseeable adverse result**

155.    The deadline for submitting applications was May 20, 2017. I received the email of my rejection on June 12, 2017. Ms Strong had 22 days to invent her table consisting of 6 rows assigning points to GPA, try those points in her excel spreadsheet to see if she had got her desired list of applicants. Actually it is so easy that it can be done in a few hours.

156.    Her invented table for assigning points to GPA was **created after the applications were submitted** (exhibit 2) and was never presented to the students before application. The only part presented to us was the table showing the breakdown of the total 103 points (which later they claimed was 91 points) to different categories.

157.    Therefore, it was not only foreseeable to her and the College what the result would be, which was misplacing students in a way that was desirable to them, but the point table for GPA was specifically defined to take me out of the list of not only

the accepted students but also the alternative students who were supposed to fill a place in case an accepted student decided they had another plan for their lives. It was not a coincident that I was the student number 25 just behind the last alternative student. **So, this is another proof of her, Mr Sass, and the College's intention to reject me.** They not only knew the harsh impact of the TEAS exam on minority students but changed the GPA points behind the scenes by trial and error in their excel spreadsheet until they got their desired applicants in the first 16 rows and the rest of alternatives.

158.    White American students disproportionately score higher in TEAS exam also because they come from more educated households vs. us, minority students who are the first generation attending college. White Americans are financially more capable of buying test taking material to get them better prepared for higher scores. White American students had the privilege of having enough money to pay $75 for the second time over their already paid $50 for the first time for taking the test again and submitting their highest score. And finally as I said when it comes to taking online testing there are companies which take the students' tests in their place with a guaranteed score. Therefore the College chose TEAS as their main discriminatory tool because it is where the white American students are dominant; the College did

not stop there and they also manipulated GPA points **after the applications were submitted** and lowered the GPA 4.0 effect on behalf of TEAS score.

159.   Ms Strong changed the points assigned for GPA and listed the students points on the excel spreadsheet accordingly, then she sorted them from the highest sum to the lowest; if the list of the high ranking students she got did not satisfy her, then she did some changes to the points assignment for GPA again and tried the sum of the points calculated for the applicants in the excel sheet again. Finally with trial and error she wrote the GPA table that fit her purpose. It was through this trial and error that Ms Strong gave extra points to the GPA of less qualified students including the 16ᵐ student and caused her to get ahead of me by only 1.17 points and be accepted instead of me.

160.   A few weeks ago I sent email to her under another name, not my real name and asked how she was going to assign points for GPA and TEAS in 2022 selection process. After a couple of days that I did not get any answer, I forwarded the email to enrollment advisers, who told me I should write to healthteam@gwinnetttech.edu which I did. They told me to write to the program specialist, Josh Vejar. (exhibit 37).

161.   Mr Vejar first told me that he could not give me the criteria and told me try to score as high as I could at both my GPA and TEAS. After I insisted and sent him

an example of my points for four categories of TEAS exam, English reading, English usage, Math, and Science plus an imaginary GPA, and asked him to tell me how my point would be according to 2021(last year's) criteria, he told me 12.63 from 14.3. He said 3.7 points were for my GPA as my actual GPA. The maximum point possible was 14.3; since GPA had maximum 4 points then 10.3 points remain for four categories of TEAS exam. Therefore the ratio of TEAS/GPA= 10.3/4= 2.58. This shows that they are following the same pattern as they did in 2017, TEAS/GPA=30/12=2.50; although what they announced to the applicants was (GPA 40)/(TEAS 30)= 1.33, which they did not follow through. So, in 2017 also they knew all the time from beginning to the end that they were not going to give GPA 40 points, **because it is their pattern and practice** to set their criteria on behalf of their discriminatory factor which in 2017 was TEAS and in 2016 was interview. They only pretended that GPA would have 40 points, but behind the scenes they degraded it to 12 points.

162.   Mr Vejar told me that he could not give me the criteria for 2022, because it might change by fall 2022. Therefore, they never give out the final criteria upon which they make their decision; they are even more cautious now after my complaint in 2017. Mr Vejar's insistence that he could not give me the criteria for 2022 because it would change shows that the College keeps the final criteria hidden

in order to give them the leverage in selecting their desired pool of applicants. What's more he was again misleading me by telling me that I should try to score as high as I could in both my TEAS and GPA, while TEAS has more than 2.5 times the value of GPA in their point assignment criteria!

### h) Circumstantial evidence- Proof of intention- Systemic and widespread Discrimination

**Page 69/138 of DOJ manual for Title VI**

"For Title VI, that kind of widespread or broad discriminatory practice is often viewed or described as a claim of "systemic discrimination"—a practice that harms a large number of minority individuals in the same manner. For example, were <u>a written test</u> used to determine eligibility for a federally funded benefit or program, and the test resulted in a much higher percentage of minorities than non-minorities being determined ineligible for the benefit or access to the program, that might present a case of systemic discrimination…."

163.    In my claim of 2017 sonography application the above mentioned test was TEAS which was given excessive attention to, just because the white American students were the ones scoring the highest in it. On the other hand GPA which could help most of minority students, because white Americans are not predominant in

achieving the highest GPAs was degraded as much as possible, overturning all the rules and regulations, and breaking their own promise of giving GPA , 40 points vs. 30 points for TEAS.

164.    In 2016 application process, the criteria of **pattern and practice** was the "Interview" that gave them unlimited freedom for selecting whoever they wanted, again white American students as the statistics show.

165.   A few weeks ago, after I read in the checklist for 2022 selection that GPA points will be the actual GPA and TEAS points will be assigned for each four categories and there was no explanation about how the TEAS scores would be assigned (exhibit 38), I sent an email to Ms Kimberly strong under another name which was not my real name and asked about the criteria of selection for 2022 to which I did not get any answer. Then I forwarded the email to admission team; they told me I should send my email to healthteam@gwinnetttech.edu, which I did. They sent me some attachments and told me if I wanted I could contact Josh Vejar, the program specialist. I wrote to him and asked about the criteria. He said he could not answer and told me to try to get as high score as I can on both TEAS and GPA. After I insisted that I needed to know how they were going to assign points in order to organize my time and resources to increase my chance as much as I could, I gave an example of TEAS points for each of four categories and an imaginary GPA and

asked him to let me know my score. He said he could not, because their criteria changes each year. I insisted that even giving my point with last year's criteria would give me some insight. Then he after asking Ms Strong said that my point would be 12.63 out of 14.3 maximum points, and told me to make sure to take TEAS twice to increase my chance.

166.   Mr Vejar said he could not give me the rubric for 2022 application (exhibit 37). According to what they say GPA points equal actual GPA, then 14.3-4=10.3 points is assigned to the 4 categories of TEAS exam, more than 2.5 times of GPA. This ratio is just similar to when they in 2017  changed the GPA points to 12 instead of 40 points that they had announced and thus made the ratio of TEAS points to GPA 30/12=2.5. But they lied all the time and said that the GPA had been given its 40 points.

167.   They are continuing their **pattern and practice** of their **systemic discrimination** by giving too much value to a basic test which is not a measure of qualification for the sonography program as opposed to GPA of prerequisites which is the foundation of the sonography program courses. The disparate effect TEAS exam has on minority students who cannot score as high as white American students, is their only incentive for such a high appreciation for the TEAS score.

168.   After receiving this answer from Mr Vejar, I sent an email to Mr

Dabrowiak in TCSG (exhibit 43) and asked them about TEAS exam which was so

popular as the main selection criteria for health sciences and let him know about the

widespread cheating that was taking place where companies are taking the TEAS

exam instead of the students, as if he did not already knew about it. Mr Derek

Dabrowiak answered that colleges have permission to use any non-subjective

criteria. He added that I should talk to my college about the TEAS. He also said that

if I found cases where colleges changed or did not follow their listed criteria I could

contact him.  I asked him that even when a college gives 60 points to GPA and 40 to

TEAS, another gives 40 to GPA and 60 to TEAS, and another college gives 4 points

to GPA and 10.3 to TEAS, yet another does not reveal their criteria, is it still

considered a non-subjective criteria? And added that the widespread cheating is

promoting dishonesty in college and the students are aiming higher score on TEAS

instead of quality education, to which he did not answer.

169.   About what he said that I could contact him when I saw a college changed

or did not follow their listed criteria, I did it in 2017(exhibit 11); I wrote him email

and explained the issue; described how they had not followed their own criteria. He

wrote to me "As for the admission to the DMS program, the college followed their

procedure for evaluating students for selection to the program. TCSG, as the

college's authorizing agency, does not overturn academically related decisions, grades, etc. The agency's role is to verify the college followed the procedures they have in place. In a review of the documents, the college has done so." Mr Dobrowiak did not investigate my claims about the college not following their procedure. What the College had followed was their secondary changed criteria not the one that was announced prior to the application deadline. Mr Dabrowiak pretended that he did not see that the College had two different criteria before and after the submission of the applications.

170.    In 34 CFR pt.100. App. B page 318 (exhibit 40) II. **Responsibilities Assigned Only to State Agency Recipients,** B. 2. "Conducting periodic compliance reviews of selected subrecipients (i.e. an investigation of a subrecipient to determine whether it engages in unlawful discrimination in any aspect of its programs)". Before my complaint Gwinnett Technical College did not have any spaces in their applications for ethnicity, race, or color information of their applicants; now they have added that information and also have added questions about parents' education, etc. Therefore TCSG was not gathering any information about the diversity in the sonography program to see if it was diverse or not, let alone investigating the fact that why it was not diverse. After I complained about the discriminatory agenda of the College and sent the graduation photos which were

80% or more white American students to him, even 100% in 2016, he did not care at all about the lack of diversity.

171.   Mr Dabrowiak also did not follow up the retaliatory and intimidating actions and speech of Ms Jim Sass on July 11, 2017, and he also did not care for the discriminatory criteria of the college and that their systemic discrimination had caused a population of 80-90% percent white Americans in sonography program and had deprived highly qualified students like me year after year.

i)  **Circumstantial evidence- Proof of Intention- Statistics demonstrating a clear pattern of discriminatory effect- proof of intention**

**Impact evidence: In many cases, including many litigated under Arlington Heights, evidence will show that an ostensibly race-neutral practice has had a much more harmful effect on minorities than on non-minorities.**

172.   I also have the photos of the previous years' graduates or students who 8 or more out of 10 are white Americans (exhibit 41 & 42). Where is the diversity that they talk about in their catalogue, or the TCSG that claims to do every measure and procedures to make sure the realization of the diversity.

# Count 2

# Breach of Contract – Steinberg vs. Chicago Medical school (1974-1977)

173. Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

174. On Casemine website stated by Mr Justice Dempsey delivering the opinion of the court is written: "4 We agree with **Steingberg**'s position, we believe that he and the school entered into an enforceable contract; that the schools obligations under the contract was stated in the school's bulletin in a definitive manner and that by accepting his application fee – a valuable consideration- the school bound itself to fulfill its promises. **Steinberg accepted the school's promises in good faith, and he was entitled to have his application judged according to the schools stated criteria."**

175. On Casemine website stated b Mr Justice Dooley delivering the opinion of the court on **Steinberg v. Chicago Medical School**: "Count III alleges that with intent to deceive and defraud plaintiffs, defendant stated in its catalogs it would use certain criteria to evaluate applications; that these representations were false in that applicants were selected primarily for monetary considerations; that plaintiffs relied on said representations and were each thereby induced to submit their applications

and pay $15 to their damage. **These allegations support a cause of action for fraud. Misrepresentation of an existing material fact coupled with scienter, deception and injury are more than adequate.** (Majewski vs. Gallina (1959)…, succinctly stated when a misrepresentation may constitute fraud: ""A misrepresentation in order to constitute a fraud must consist of a statement of a material fact, false and known to be so by the party making it, made to induce the other party to act, and, in acting, the other party must rely on truth of the statement. (Roda v. Berko, 401 III, 335." **<u>Plaintiff's allegations meet the test of common law fraud</u>**.""

176.   **The plaintiff and defendant had entered into a contract**: I registered in the College as an answer to Gwinnett Technical College's invitation letter (<mark>exhibit 9</mark>) to register in their "Healthcare Science Certificate program **in preparation for the competitive health program selection process.**" The only reason I registered in Gwinnett Technical College Healthcare certificate program, was that **<u>they were supposed to get me prepared</u>** for the competitive selection of the Sonography degree program; otherwise there was no reason to pass 29 credits in certificate level without getting into the degree level. Therefore, our contract actually started on June 27, 2016 when they sent the invitation letter after they had tested me for preparedness with Compass test in their college. During the two years

study in the certificate level, I paid them almost $4,000, was a very disciplined student, studied hard in preparation for the competitive health program selection whatever the College offered for learning, and literally soaked everything they taught me like a sponge; I got my A+GPA, got A+ in the other 9 required prerequisites, prepared my application, took the TEAS exam, submitted my application in good faith trusting that as what they claimed in their catalogue they were honest, committed, had integrity, and as they claimed they meant what they said.

177.   *The College claimed that the Certificate program which took 2 years and I paid them almost $4,000 for it was going to prepare me for the Associate degree program competitive selection.* I did all I was supposed to do and got an A+ in my Certificate program, but when I applied to continue in their Associate degree level they rejected me. Mr Sass for example in his letter explaining why they rejected me (exhibit 6) said: "…**we use a competitive process to help us find students that we hope will be successful and complete the program**." The certificate program as they claimed was registering me to prepare me for the competitive selection. If after earning a GPA of A+ in my certificate level and A+ in 9 other required credits for the sonography degree they found me unprepared for the degree level, it was not my fault. I got an A+ in all they taught

me; therefore I am an excellent learner. If I was not selected as a qualified student then they did not teach me what I needed in order to be selected, or there was something wrong with their competitive selection criteria which did not select more qualified students but selected their desired pool.

178.   On the other hand they announced the "Applicant Assessment Check List" (exhibit 1) describing the criteria that the College would employ in evaluating the applicants and such constituted an invitation for an offer to apply; the filing of applications constituted an offer to have our credentials appraised under the terms described by the College and <u>the College's voluntary reception of the application constituted an acceptance, the final act necessary for the creation of a binding contract.</u> I did my obligations to the excellence; therefore, I expect the same from Gwinnett Technical College.

179.   **The plaintiff performed as specified or was excused for nonperformance**: I registered in the college as an answer to their invitation letter (exhibit 9 ) to register in their "Healthcare Science Certificate program <u>in preparation for the competitive health program selection process</u>. Therefore, our contract actually started on June 27, 2016 when they sent me the invitation letter to register in their certificate program for healthcare. During the two years of studying in certificate level I paid them almost $4,000, was a very

disciplined student, studied hard in preparation for the competitive health program selection, literally soaked everything they taught me; in our physiology and anatomy course I was so accurate that I found a couple of mistakes in the book that then the instructor confirmed after finding the correction done by the publisher and brought a copy of it to me. I got my A+GPA, got A+ in the other 9 required prerequisites, prepared my application, took the TEAS exam, submitted my application trusting that as what they claimed in their catalogue they were honest, committed, had integrity, and as they claimed they meant what they said.

180.   I did all I was supposed to do and got an A+ in my Certificate program, but when I applied to continue in Associate degree level they rejected me. Mr Sass for example in his letter explaining why they had rejected me said: "…**we use a competitive process to help us <u>find students</u> that <u>we hope</u> will be <u>successful and complete the program</u>**." The certificate program as they claimed was registering me to prepare me for the competitive selection. If after a GPA of A+ in my certificate level and A+ in 9 other required credits for the sonography program they found me unprepared for the degree level, it was not my fault. I got an A+ in all they taught me; therefore I am an excellent learner. If I was not well prepared then they did not teach me what I needed in order to be prepared.

181.  On the other hand they announced the "Applicant Assessment Check List" describing the criteria that the College would employ in evaluating the applicants and such constituted an invitation for an offer to apply; the filing of applications constituted an offer to have our credentials appraised under the terms described by the College and the Colleges voluntary reception of the application constituted an acceptance, the final act necessary for the creation of a binding contract. I did my obligations to the excellence; therefore, I expect the same from Gwinnett Technical College. I expect them to respect the criteria they had presented before the application's deadline (exhibit 1)  and not the post hoc point assignment for GPA (exhibit 2) done after the submission of the applications.

182.  **Defendant's unjustified or unexcused failure to perform under the contract (breach of the contract):** As explained in the above paragraph I had entered into a contract with the College to prepare me for the competitive selection process as per their invitation letter when I registered in the sonography certificate level program. I did all my obligations; soaked what they taught me like a sponge, got A+ in 18 prerequisites and A+ in other 9 required credits. But when I applied for the degree level, they did not have any hope that I could succeed and complete the program, and rejected me as Mr Sass said. Ms Rebecca Alexander said that the

competitive selection process was very challenging **even for high-achieving students**. I was ready for the challenge; they came short in teaching me.

183.   They had registered me in the certificate program to prepare me for the sonography degree level competitive selection process and **I accomplished the highest score A+ showing that I had been evaluated by them and according to their own standards <u>had achieved the objective of the certificate level at the highest</u>, which was <u>also meaning preparedness for the degree level</u>, but the College rejected me from the degree level.** On the other hand, the College stated in their printed announcement (exhibit 1) the certain criteria they would use to evaluate their applicants. Especially, the college's emphasis on the right top corner of all its "Applicant assessment checklists" for previous years and also for 2017 (exhibit 1, 33) implied the idea that to take courses to increase GPA will increase one's chance of being selected specially that GPA was listed as having 40 points the highest points among all categories (exhibit 1& 33) and TEAS had only 30 points, whereas in their post hoc, behind the scenes  table of points for GPA (exhibit 2) they had given GPA only 12 points instead of 40 points  that they had announced and promised.

184.   The correct table for GPA point assignment in compliance with what was announced, which is also consistent and coherent with point assignment for TEAS,

was prepared and proved by Plaintiff (exhibit 19, 20, 21, and 28) and confirmed by experienced Math Tutor (exhibit 20) . The correct assignment of points to GPA was very easy, just like what Ms Strong did for TEAS. The difference between the highest GPA, 4.0 and the lowest GPA 2.5 which is 1.5 points should be divided into 40; the result which is 0.0375 is the interval between the two adjacent scores like the interval 0.83 she had achieved for TEAS point assignment! It can also be done through formula that I have shown in exhibit 20 and 21 also which gives the same result; the formula method gives the exact point assignment for each GPA and is more accurate.

185.   The College did change the point assignment for GPA **after submission of the applications**; squeezed the gap between lower GPAs and the GPA 4.0, as a result applicants were practically selected mainly based on their TEAS points.

186.   The College did not deny that they had changed the GPA scale; the College did not want to talk about what they had announced and what they had implemented and their difference. Ms Alexander in her letter wrote to me that a scale had been used; she did not say that the College had used the same scale that had promised in their announcement. Ms Alexander's defense was that since the same scale had been used for all applicants therefore everything was legitimate. But the issue is that I was adversely affected by their change of criteria, because it did not increase my

GPA points like it did for others with lower GPAs; also she did not explain **what made them to change the criteria after the submission of the applications?!**

187.   I relied on their presentations pretending to give 40 points for GPA and 30 points for TEAS (exhibit 1), which meant GPA was more important than TEAS; what's more they had promised in their invitation letter (exhibit 9) that the courses I studied in certificate level were preparing me for the competitive selection and implied that my GPA was the main factor in the evaluation process. Also, in their catalogue they had written that the prerequisite courses were the foundation of the associate degree program.  I submitted my application in good faith and expected it to be considered in a just and fair process of evaluation and selection according to the criteria that they had promised.

188.   Since I had fulfilled all the requirements and was ahead of other applicants in my qualifications, namely applicant number 16 the last accepted applicant, when evaluated on the basis of their represented criteria, and I proved my prima facie case (exhibit 32) and also (exhibit 25) that I would have had more points and therefore would have been selected if the College had used their represented criteria, the College had the obligation to accept me. I was rejected because they had adjusted their criteria **after submission of the applications** to accommodate more white American students by manipulating GPA points. They not only used TEAS which

was 50% English fluency test which they had not prepared me for it during the past two years, because we only had 3 credits for "composition and rhetoric" among all 27 credits we passed; but also changed the points they had promised for GPA **after the applications were submitted** and made TEAS points to dominate the selection process.

189.   **Resulting damages to the plaintiff**: I spent two years, studied very hard, spent almost $4,000, and achieved an A+ GPA in the certificate level which was supposed to prepare me for the competitive selection for degree level. I applied for the Sonography Associate degree; the College rejected me because they said they did not have hope that I would succeed and complete the program and that it was challenging for even high achieving students! I received an "Applicant Assessment Check List" (exhibit 1) describing the criteria that the College would employ in evaluating the applicants and such constituted an invitation for an offer to apply; the filing of applications constituted an offer to have our credentials appraised under the terms described by the College and the Colleges voluntary reception of the application constituted an acceptance, the final act necessary for the creation of a binding contract.

190.   They not only used TEAS which was 50% English fluency test which they had not prepared me for it during the past two years, because we only had 3 credits

for "composition and rhetoric" among all 27 credits we passed; but also changed the points for GPA after the applications were submitted and made TEAS points to dominate the selection process. The College pretended that GPA of the prerequisite courses were very important in their announced checklist, their invitation letter, and the description of those courses as the foundation of the sonography degree program in their catalogue (exhibit 13), but then they cheated by selecting the students mainly according to their TEAS exam scores, a four hour exam of mostly English fluency test.

191.    As I proved in my prima facie case above, Ms Strong designed the point assignment table for GPA **after submission of the applications** using trial and error in her excel spreadsheet to have those applicants she wanted to be selected, listed in the first 16 rows; that table gave GPA only 12 points instead of 40 points the College had promised. Ms Strong gave extra points to the GPA of less qualified applicants with low GPAs to elevate their total sum as I explained in my prima facie case and caused less qualified students including the 16th applicant to have more points and her name appeared before me in the list of accepted applicants.

192.    I was deprived of my right to education and to get my Degree in the Associate Degree of Medical Sonography program of Gwinnett Technical College, by Mr Sass, Ms Strong, Ms Rebecca Alexander, Gwinnett Technical College, and

TCSG namely Mr Derek Dabrowiak who approved and supported all the wrongs that the College did against me, explained in this claim and all other claims I mentioned in this letter. I lost my opportunity to get my sonography Degree and get to work in the field which the median salary for it according to ZipRecruiter "As of Dec 22, 2021, the average annual pay for a Diagnostic Medical Sonographer in Georgia is $75,805 a year". I also took trouble of investigating, thinking, analyzing, documenting, collecting evidence and proof, preparing all my complaint letters to the College, TCSG, OCR, and all other correspondence, suffering in patience while waiting for a fair and impartial judgments which I did not get, and **finally studying LAW in order to prepare my complaint to the Federal Court, because there were no lawyers working for students right for admission to colleges in Georgia if the student was not disabled. All of the education lawyers are hired by educational institutions.**

193.   I had to wait stressfully and in distraught each time for years patiently and with lots of pray. My husband and I were insulted and threatened by Mr Sass inside building 200 of the College on July 11, 2017 just because I wanted to gain some input on my point status as per invitation of Ms Thurmond. All this trouble was burdened on my family, especially my husband.

194.   I request this Court to issue an injunctive relief for the selection process of Sonography program in Gwinnett Technical College and take it under strict scrutiny for future violations.

195.   I request this Court for imposing punitive damages on all participants in the conspiracy of rejecting me and then supporting each other in covering up of their fault and wrongdoing with the price of depriving hard working students like me from their constitutional right, education, working, and liberty.

196.   I request this Court to impose monetary compensation by the defendants to me for the loss of my education opportunity and loss of my working and earning opportunity/capacity for at least 5 years that I have been following up this case or for how long this trial takes with the median salary of a sonographer in GA which is $75,805 for each of these five years or more, which makes it $379,025 or more. They cheated in their selection process and accepted less qualified applicant(s) namely applicant 16th instead of me as proved in my prima facie case.

197.   I also request this Court to impose any other fines, punishment and compensation that this Court deems necessary on the defendants.

198.   I request this Court to make the defendants pay for all the Court expenses I had to pay out of pocket including the Complaint filing fee and preparation of the

copies of the complaint letter and mailing fee, also any other court related expenses incurred later.

199.   I request this Court to punish the defendants for promoting and encouraging the spirit of dishonesty and unhealthy competition among the students by making the TEAS exam scores their main selection tool despite widespread cheating and also its discriminatory effect, pretending to not be aware of either.

200.   As a direct and proximate result of defendants' unlawful intentions and acts, Plaintiff has sustained injuries and damages as mentioned in the previous paragraphs.

## Count 3

## Fraudulent and deceitful Misrepresentation
## Steinberg V. Chicago Medical School 1974-1977

201.   Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

202.   On Casemine website stated by Mr Justice Dempsey delivering the opinion of the court: " 4 We agree with **Steingberg**'s position, we believe that he and the school entered into an enforceable contract; that the schools obligations under the

contract was stated in the school's bulletin in a definitive manner and that by accepting his application fee – a valuable consideration- the school bound itself to fulfill its promises. **Steinberg accepted the school's promises in good faith, and he was entitled to have his application judged according to the schools stated criteria."**

203.    On Casemine website stated b Mr Justice Dooley delivering the opinion of the court on **Steinberg v. Chicago Medical School**:  "Count III alleges that with intent to deceive and defraud plaintiffs, defendant stated in its catalogs it would use certain criteria to evaluate applications; that these representations were false in that applicants were selected primarily for monetary considerations; that plaintiffs relied on said representations and were each thereby induced to submit their applications and pay $15 to their damage. These allegations support a cause of action for fraud. Misrepresentation of an existing material fact coupled with scienter, deception and injury are more than adequate. (Majewski vs. Gallina (1959)…, succinctly stated when a misrepresentation may constitute fraud: ""A misrepresentation in order to constitute a fraud must consist of a statement of a material fact, false and known to be so by the party making it, made to induce the other party to act, and, in acting, the other party must rely on truth of the statement. (Roda v. Berko, 401 III, 335." **Plaintiff's allegations meet the test of common law fraud**.""

204. **A representation was made**: Ms Strong, Mr Sass, and Gwinnett Technical College in February 2017 published and gave out the selection criteria for the sonography program as "Diagnostic Medical Sonography Program-Applicant Assessment Check List" (exhibit 1) to the applicants. In this representation GPA was assigned 40 points and TEAS was assigned 30 points, therefore GPA had 10 more points than TEAS in value and was supposed to be the most important factor in the selection.

205. **The representation was false**: After I was rejected and was informed that students with lower qualifications were accepted, I went to talk to Mr Sass and then to Ms Strong. When my husband and I met Ms Strong on June 14, 2017, she told me that I was not qualified and was rejected. Before leaving I asked her to give me a copy of criteria according to which she had assigned points to the applicants to have an explanation to why I was rejected. I got three page prints (exhibit 2,3, & 4) which she gave me from a big print machine that was across the hallway in building 200, two of which was the points she had assigned to different categories and one was a line of excel spreadsheet with different columns showing my points from different categories and the sum of my points. When I looked at them at home I noticed that she had created a table for GPA points which was giving to GPA only 12 points contrary to what she, Mr Sass, and the College had clearly put in their admission

criteria announced to the applicants (exhibit 1) which was 40 points, but they had given TEAS the same 30 points they had mentioned in the applicant checklist. The numbers assigned to the GPAs was not following any rule or formula, and they were not consistent with the method the points had been assigned to TEAS and other categories. She even made some equations of her own and assigned GPA 3.751= GPA 4.0=40 points, and similar equations for other ranges of GPA.

206.    That post hoc and behind the scenes assignment of the points for GPA caused my rejection from the program as I proved in my prima facie case in (exhibit 32) and also in (exhibit 25), because it gave those students with higher TEAS and lower GPA (mostly white American students) a big advantage over those students with 4.0 GPA and lower TEAS scores (mostly minority students including me).

207.    Actually she had designed the table for GPA points **after submission of our applications;** she used the excel spreadsheet and sorted the students from the highest sum of points to the lower sum of points. She kept changing the table for GPA points until she was satisfied with the first 24 rows of the list of students according to her desire in the excel spreadsheet. The obvious proof of her intention and purpose is that I was applicant number 25 on her list, just one after the last person invited to the mandatory session for final selection.

208.   After I took my complaint to the College's academic affairs, they supported

Mr Sass, and Ms Strong, and wrote to me that since the criteria was the same for all

applicants, therefore my scores were correct and I was justly rejected from the

program. In (exhibit 25) I have proved that I was adversely affected by the

manipulated criteria and just because it was the same for all applicants it does not

mean that it was just and fair. Besides, **changing the criteria after submission of**

**the applications was illegal!**

209.   After OCR Atlanta wrote to me that the last accepted applicant, ranked

sixteen was only 1.17 points ahead of me. I built my prima facie case (exhibit 32)

based on the fact that if the College had followed their own criteria I would have

7.50 points more than the applicant number 16, and the only thing that caused her

selection over me was the extra points which Ms Strong had assigned to the GPA of

that white American student.

210.   Besides, on the right top corner of the "Applicant Assessment Check List"

they wrote inside a box: "Classes may be taken in efforts to increase one's GPA, the

course grades will be averaged together to calculate the applicant's pre-requisite

GPA." They did this false advertisement to make the students believe that by

increasing their GPA they were going to have more chance to be selected in the

program, while in their behind the scenes criteria they had given only 12 points instead of the 40 points they had promised to GPA.

211.   I was an A+ student with TEAS score in 96 percentile and they still rejected me; nonetheless they were cheating students into re-taking their classes, paying to Gwinnet tech and registering in Gwinnett Technical College for the classes they had already passed with the hope of getting a higher GPA while the College was almost not considering the GPA in their competitive selection! The ratio of GPA points to TEAS points in 2017 selection was 12/30=0.4 . This ratio in 2021 selection was even smaller, 4/10.3=0.388. The College never gives out the point ratios for GPA and TEAS before the submission of the applications, to give themselves the freedom of manipulation after the submission of the applications like they did in 2017.

212.   The College should tell the truth to the students, therefore they know where exactly they put their efforts, time, and money which is TEAS not GPA. In 2016 they had written on the checklist (exhibit 33) "Final Applicant Selection is based on Interview Scores" and in the other more updated checklist they assigned 48 points to interview vs. 40 points to GPA, which was so outrageous that it was brought to the attention of TCSG, and they told the College that the interview was too subjective and they should change the criteria. The College substituted the "interview" with "TEAS" and "essay" in 2017 to give them the same freedom the "interview" gave

them; they also used manipulative point representation for the selection criteria exaggerating TEAS score and getting them to their desired population of white American students of 80-90% by changing the GPA point assignment **after submission of the applications.**

213. **That when made, the defendant knew that the representation was false or that the defendant made the statement** recklessly **without knowledge of its truth**: Ms Strong, Mr Sass, Ms Alexander, and the College all knew that the criteria that they had presented to us was false and that was not the final criteria which was supposed to be used as the real selection criteria. They knew it because that was not a surprise for them when I wrote to them and proved that the point assignment for GPA which was used was not the one the College had promised us. Ms Rebecca Alexander, the Vice President of Academic Affairs wrote to me (exhibit 8): "It appears that the major point of issue is the grade point average (GPA) scale. A student's GPA is one factor considered in the application process and the score is assigned **based on a scale**. Your concerns and calculations regarding this process have been noted, and while **I understand your dissatisfaction with the scale used**, the same established scale is used in relation to all applicants to the program and remains as such. Your GPA score will stand as is." As it is seen in her letter she did not say that the score was assigned based on their announced scale, but

115

based on a scale. Besides, I got 40 points which was supposed to get; my point did not change with the announced or manipulated point assignment. The issue was that the manipulated point assignment increased the GPA Point of other students but did not increase mine and therefore I was not treated the same way as applicant number 16 who got extra points for her GPA. **Ms Alexander was clearly playing ignorant by saying that my GPA score would stand as was. What she said was completely irrelevant. It was not just my GPA point by itself, but its difference with other applicants' GPA points that was the determinant of who was selected. Ms Alexander pretended not knowing this fact!**

214.   My claim is that it is not enough that a scale was used for assignment of points to GPA, and <u>**the specific scale that the College had announced should have been used in calculation of the points for GPA!**</u> The College was supposed to use the same type of scale that was used for TEAS with the only difference that TEAS was scaled on 30 point scale and GPA was going to be scaled on 40 point scale (exhibit 1). According to what the College had announced GPA was supposed to be the most important factor by having the highest points among all other categories, but **after the submission of the applications** GPA fell down to a category with almost no effect.

215.  The College, **after submission of the applications** invented a completely different point table for GPA which is not in accordance with any scale definition or formula. They had no explanation as of why the point assignment was not the same as we applicants were told and were expecting; they did not have any explanation as to why they had not followed the point assignment method they had used for TEAS. They simply said that I had no right to protest **because the same criteria was done for all of the applicants.** But not all of the applicants were adversely affected as I was (exhibit 25). Besides, if no one else protested for their rights it does not deprive me from my right to protest for my right and ask for a just and fair admission based on the same announced criteria not the one which was **created after the submission of the application**, and its honest and just execution.

216.  **That the fraudulent misrepresentation was made with the intention that the plaintiff rely on it:** The representation of the admission criteria for sonography (exhibit 1) was the official announcement to the applicants who were getting ready to compete in a very competitive selection process. Everything was serious; we were following the announcements of the College especially that they started to change just 3 months before the application deadline. I put all my efforts to get as high GPA as I could, since the GPA was announced to have 40 points, as having the highest points among all the categories, thus the most important factor. **Had I known that**

after the submission of applications they would change the points for GPA and would give GPA only 12 points, I would have invested in TEAS exam rather than GPA as I have shown in the example of someone investing in a banking account in (exhibit 25) and would have had more points and would have been accepted.

217.   I spent 2 years of my life, spent almost $4,000 out of my pocket without taking any loan, putting the charges on my husband's credit card, killed myself studying so hard and got A+, only to come to know that the College had lied to me and they misrepresented the value of GPA. I believed their advertisements and official announcements. In their catalogue they write "We mean what we say." "We are committed to our students." "We strive for diversity." "We respect our students." But, I did not see any of those values and integrity in their conduct.

218.   Even after they came to know that an A+ student of their own college was unjustly rejected, they confirmed that I would not be a successful prospective student and was not good enough for the sonography degree program. They callously rejected me knowing that I was right and they had not followed their own criteria. When I wrote to TCSG and explained that they did not follow their own criteria, and I also explained the retaliatory conduct of Mr Sass in building 200 on July 11, 2017, Mr Derek Dabrowiak wrote: "As for the admission to the DMS

program, the college followed their procedure for evaluating students for selection to the program. TCSG, as the college's authorizing agency, does not overturn academically related decisions, grades, etc. The agency's role is to verify the college followed the procedures they have in place. In a review of the documents, the college has done so."

219.  Mr Dabrowiak lied knowingly and supported the college although he knew that they had not followed the criteria published before applications were submitted. I had explained that Ms Strong had created that table for GPA **only after the applications were submitted** and it was not shown to us in any of their announced forms. I also brought to his attention that always 80-90% of the students were white Americans; but he did not care for the diversity as long as everything was done in a way that would not cause any legal issue for TCSG. He kept silent. "TCSG, as the college's authorizing agency, does not overturn academically related decisions, grades, etc."

220.  What about TCSG's role in prohibiting and investigating any retaliatory conduct by the recipient's employees; I reported the retaliatory speech and actions of Mr Sass towards me, my husband, and Ms Tavia Thurmond as explained in above paragraphs, but I did not hear back anything from Mr Derek Dabrowiak; that was certainly not requiring overturning academically related decisions, grades, etc.

221.  As long as everything is done clean and cannot be challenged legally he is ok with it; he does not care if our colleges are diverse in their lucrative programs of study like sonography even after I brought the issue directly to his attention, whereas it is the responsibility of their agency to get the statistics and examine the number of minority students in all the programs of studies and in case their findings shows suspicious discrimination their agency has the responsibility for remedial actions and processes. It is written in **Title VI and its implementing regulation at 34.C.F.R. pt.100(b)(6)(ii)**Even in the absence of such prior discrimination, a recipient in administering a program may take affirmative action to overcome the effects of conditions which resulted in limiting participation by persons of a particular race, color, or national origin.

222.  **That the plaintiff did rely on the fraudulent misrepresentation**: Of course I relied on their fraudulent misrepresentation; I did not have any other sources to rely on. I was a simple, hardworking student from a decent hardworking family. I never cheated during all the years in any of my classes or exams. I relied on my own talent, abilities, and I trusted that if I pursue the highest possible grades as I did with GPA of A+, then with 40 points of GPA vs. 30 points of TEAS I had a very good and decent chance of being among those accepted students.

223.   Money was tight for me; my husband was the only one working; but, still if the College was transparent as they boast to be when talk about their integrity and had made it clear that TEAS was what they were going to consider and it was supposed to have 2.5 times the value of GPA, I would have thought twice and would have borrowed some money, I would have invested my money and time in TEAS rather than GPA.

224.   However, the College lied intentionally and even created the false belief that if we increase our GPA we had a better chance. Even in the last email I sent to the College under another name a few weeks ago (exhibit 37) when I asked about the points for TEAS and GPA for 2022 selection, they did not give me the information. Mr Vejar, the program specialist, told me to try to score as high as I could in both TEAS and GPA. He was not transparent and he was again misleading me.

225.   After insisting a lot that I need to organize my resources and time and money to get the highest chance, Mr Vejar just told me an estimate of my points sum according to 2021 criteria, which then revealed that they had given GPA maximum 4 point vs. 10.3 points for TEAS! Although TEAS has 2.58 times the value of GPA, he was lying to me and encouraging me to study as hard for my GPA as for my TEAS! They are still continuing to keep their criteria secret or only reveal

them for a certain group. I could not get their criteria for 2022 despite trying hard. (exhibit37)

226. **That the plaintiff suffered harm as a result of the fraudulent misrepresentation:** I was rejected from the sonography program, because I believed their announcement that was giving GPA 40 pints vs. 30 points of TEAS, while in fact **they had changed the criteria after submission of the applications** and had given in practice only 12 points to GPA which I came to know only after I asked Ms Strong for a copy of criteria according to which she had rejected me. The table for GPA points she had designed (exhibit 2) was never given to the students.

227. As I explained in above lines GPA was supposed to have 40 points! In the email that I wrote a few days ago to Gwinnett Tech to know about their selection criteria under another name, I gave them an imaginary GPA and 4 imaginary percentages for the four categories of my TEAS exam and asked Mr Vejar to let me know what my final point would be. Here is their answer. "Your score would have been: 12.63 out of a 14.3. The decimals make the difference. I am unable to give you the latest rubric (Fall 2022) because I do not have it. And please do not expect the program to use last year's rubric as well. It may change by Fall 2022. We recommend students to take the TEAS exam at least twice before applying to the program. Please let me know if you have any further questions. Joshua David

Vejar, Program Specialist, Health Sciences Department" As Mr Vejar said "the decimals make the difference."

228.    However, in 2017 even if we ignore that the points for GPA was totally wrong because was not based on a 40 point scale for GPA, again Ms Strong, Mr Sass, the academic affairs Ms Rebecca Alexander at least should have agreed that equating 3.751GPA to 4.0GPA when they were saying that the selection was done strictly based on the points, and according to what Mr Vejar said the decimals made the difference, was a manipulation in the selection process. Even if we do not consider the 40 points weight of GPA and calculate the difference of raw values without considering their weights, still 4.0 - 3.751=0.249 which makes the difference almost 2.5 decimal points! Although considering the 40 points weight of GPA (exhibit 19, 20, 21, & 28) the difference of points between the GPA 3.751(33.36 points) and GPA 4.0(40 points) is 6.64 points. If I had known from the beginning that the College would not keep their promise and would give the same points to GPA 3.751 as to GPA 4.0 I would not put all my energy into gaining the highest possible GPA; instead I would have tried to score as high as I could in TEAS.

229.    As a direct and proximate result of defendants' unlawful and deceitful misrepresentation of the competitive selection criteria for the sonography program,

Plaintiff has sustained injuries and damages; Plaintiff was rejected from the program of Sonography of Gwinnett Technical College, while less qualified students were accepted. Plaintiff lost the opportunity of continuing her education after spending almost $4.000 in class registration, exams, books, commute, and suffering because of a lot of stress for studying very hard for the highest GPA as encouraged and advertised by the college, only to come to know after rejection that her hard work was not appreciated at all, because the College had done the selection according to an internal, behind the scenes criteria which was contrary to what they had announced.

230.   Therefore I request that this Court bring justice to my case and approve that the College's change of criteria for the selection of the students after the facts was violation of the honest and legal practice and that Ms Strong, Mr Sass, the academic affairs and the College have committed deceitful misrepresentation. According to the announced GPA points I have proved that I would have been accepted in the program in my prima facie case (exhibit 32).

231.   I request this Court to issue an injunctive relief for the selection process of Sonography program in Gwinnett Technical College and take it under strict scrutiny for future violations.

232. I also request this Court for imposing punitive damages on all participants in the conspiracy of rejecting me and then supporting each other in covering up of their fault with the price of depriving hard working students like me from their constitutional right, education, working, and liberty.

233. I also request this court to impose monetary compensation by the defendants to me for the loss of my education opportunity and loss of my working and earning opportunity/capacity for at least 5 years that I have been following up this case or how long the trial may take with the median salary of a sonographer in GA which is $75,805 for each of these five years or how long the trial takes, which makes it $379,025 or more. I also request this Court to impose any other fines, punishment and compensation that this Court deems necessary on defendants.

234. I request this Court to make the defendants pay for all the Court expenses I had to pay out of pocket including the Complaint filing fee and preparation of the copies of the complaint letter and mailing fee, also any other court related expenses incurred later.

235. Also, I request this Court to punish the defendants for promoting and encouraging the spirit of dishonesty and unhealthy competition among the students

by making TEAS exam scores the main selection tool despite widespread cheating and also its discriminatory effect, pretending to not be aware of either.

## Count 4

## Retaliatory conduct of Mr Jim Sass

236.   Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

237.   **Title VI and its implementing regulation at 34.C.F.R. pt.100.8 (e)** "**Intimidatory or retaliatory acts prohibited**. No recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by section 601 of the Act or this part, or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this part."

238.   In Gwinnett technical college catalogue we read "**TCSG will not tolerate retaliation for having filed good faith harassment and /or discrimination complaint or for having provided any information in an investigation. Any individual who retaliates against a complainant or witness in an investigation will be subject to disciplinary action, up to and including expulsion or dismissal.**"

239.    I wrote in my letter to TCSG (exhibit 11), Mr Derek Dabrowiak in 2017 how Ms Caldwell intimidated me that I could not apply and be accepted in the sonography program if I did not follow her orders in the sonography lab, how Ms Strong harassed me, ridiculed me and also insulted me by telling me "it was none of your business" and how Mr Sass told me in the meeting I had with him in June 2017 to discuss my rejection from the program that he would have given zero to my essay if he was in the place of Ms Strong. I also explained him that how Mr Sass on July 2017, intruded into the room where my husband and I had a meeting with Ms Tavia Thurmond, the program specialist, in response to her invitation in my rejection email to get some input on my status of points and use Ms Thurmond's advice; Mr Sass started shouting at us, threatened Ms Thurmond not to talk a word with me because she was working for him. Mr Sass told me since I had complained against the selection process I should wait for my complaint to go through its process and should stay away from the College and did not have any further rights. Therefore, Mr Sass did not allow me to get any information regarding my point status on 2017 application or to improve in my next year application. Then Mr Sass called police on me as explained in the above paragraphs of my allegations of facts. My husband who is a very decent man encouraged me to leave the 200 building before the arrival of Police. When coming out of the building we saw the police car and the police

standing by the car and he was about to come in and throw me and my husband out like criminals. Neither the College nor TCSG and OCR did condemn their conducts, especially the very vicious and hostile conduct of Mr Sass. They did not support me or ask further questions for any investigations. I wrote about this incident to TCSG (Technical college of GA), and they also ignored it.

240.   From DOJ Title VI manual page 121/138: "**The Supreme Court has defined retaliation as an intentional act in response to a protected action.** Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 173-74 (2005). Citing Jackson, the court in Gutierrez underscored the intentional nature of a retaliation complaint: "Retaliation is, by definition, an intentional act. It is a form of "discrimination" because the complainant is being subjected to differential treatment." Gutierrez, 2005 WL 2346956, at *5."   As I was banned from access to the information about my status among other applicants and from getting any advice from Ms Thurmond by Mr Sass, because I had complained.

241.   And from footnote 3, page 123/138 of DOJ Title VI manual: "**A recipient violates Title VI if it retaliates against a private individual who opposes a discriminatory action or participates in a matter alleging discrimination whether the underlying matter concerns intentional discrimination or disparate impact. As noted above, retaliation is a form of intentional discrimination,**

which Title VI clearly covers. See Jackson, 544 U.S. at 173-74 ("**Retaliation is, by definition, an intentional act**."). <u>If a recipient intentionally takes an adverse action against an individual because he or she alleged that it violated Title VI, it should not matter whether the alleged violation raises an intent or disparate impact claim, particularly within the administrative setting.</u>"

242.  Even in the last page of OCR Atlanta letter of finding they wrote: "Intimidation or retaliation against complainants by recipients of Federal financial assistance is prohibited. No recipient may intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by the laws OCR enforces, or because one has made a complaint, or participated in any manner in an investigation in connection with a complaint." I don't know why they included this paragraph in their letter? I had sent my allegations about the retaliatory action and speech of Mr Sass to them in my complaint and they did not even acknowledge it let alone condemn it. This all seems to me like a big lie or cover up. Why they emphasized something as their law in their letter, while they did not act upon it?! I cannot believe what OCR did. They ignored it as if nothing had happened. <u>Mr Sass's conduct was aimed to block me from accessing information about my application result and also to frighten me,</u> and he achieved that aim, because I felt so oppressed and humiliated that never went

back to Gwinnett Technical College or for that matter any other college. If my own college treats me, a very disciplined, A+ student, in such an inferior and contemptuous way then how they treat other students or what can I expect from other colleges. All white authorities I have encountered in Gwinnett Technical College and also Mr Dabrowiak are callous to us minority people and black people are under these white people's authority and they do not confront them in order to hold on to their jobs and also some of them are hypocrites when it comes to minorities other than African Americans. The system is letting these oppressions to take place. I do not know if Ms Thurmond officially had complained against Mr Sass for harassment and intimidation.

243. I wrote about the incidence of retaliation by Mr Sass to the College and to TCSG and OCR. All ignored that anything important had happened. Then I read in DOJ manual for title VI that any retaliation toward the complainant should be treated very seriously and that even if the intentional discrimination or even disparate discrimination has not been proven yet, any retaliation, intimidation, harassment of the complainant should not be tolerated by the recipient.

244. As a direct and proximate result of the defendants' unlawful discrimination, Plaintiff has sustained injuries and damages, Plaintiff was deprived of her right to get any input about her point status among other applicants or how she could

improve in the next year application of the sonography program; Plaintiff was discouraged and felt intimidated and unwelcome to participate in next years' applications as Mr Sass emphasized that I had nothing to do in the college while my complaint was under investigation and he tried to throw me and my husband out of the college using police force. Plaintiff and her husband felt oppressed, humiliated, and distraught as the result of the condescending behavior of Mr Sass even to this day whenever the memory of that day comes back in their mind. Plaintiff's right to free speech (US constitution first amendment) was violated by Ms Caldwell, Ms Strong, and by Mr Sass, the College, and TCSG. Plaintiff has since been struggling with her sense of inferiority and lack of confidence induced by rude, inconsiderate and hostile behavior of Mr Sass towards her husband and her in a degree that she felt too defeated and hopeless to apply again. Plaintiff did not get justice for the bad and unacceptable behavior of Mr Sass; I did not receive any apology from the recipient's side and acknowledgement that what happened was inappropriate, illegal and violation of my right. As a result of Mr Sass's hindrances I could not access my point difference with the last accepted student, applicant number 16, until more than two years after the application when I received the answer to my complaint from OCR Atlanta, and it was only then that I could prove my prima facie case!

245.   For all the reasons mentioned above I request this Court to impose the highest punitive punishment or any other punishments deemed applicable by this Court, on  Ms Strong, Ms Alexander, the College, and Mr Dabrowiak from TCSG, and also OCR that overlooked the above mentioned retaliatory acts. I also request and trust that this Court will order any other punishment deemed necessary for the defendants according to the relevant laws.

246.   I request this Court to consider punitive punishment and any other punishment according to the relevant laws for Mr Sass that this Court deems applicable for his inhumane and illegal conduct toward me and my husband, violating my 1st amendment right, my complaint right under title VI and retaliating against me and hindering me from access to any information about my status in the selection process.

## Count 5

## Violation of Amendment No. 13 of the US Constitution

Neither slavery nor <u>involuntary servitude</u>, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

247.   Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

248.   One of the categories for the selection of the sonography applicants as explained in the above paragraphs and according to the official announcement of the College (exhibit 1 & 33) was "Volunteer as a patient in the DMS lab: 1 point per hour, up to 6 hours – points assessed :up to 6). The College exploited the applicants for their Sonography program to work for them 6 hours each, as patient in the sonography lab. Add to those 6 hours the burden of setting up appointments, commute, waiting time, discomfort of tolerating the cold gels on our bodies, having to expose our bodies to the students and clinical coordinators, the pain caused by the pressure of the sonography probe on our internal organs by the students who were not professionals. One time I had pain in my ribs and upper abdomen until three days after the scan session due to the pressure from the probe.

249.   They added the word "voluntary" in the explanation of the category to make it legal and to make sure they won't have any trouble, but nothing about those six hours were voluntary! The word "voluntary" here is just like their "40 points" that they pretended to give to GPA but they did not give. We had to act as a patient in their sonography lab or we would lose 6 points; we did not have any other choice! We certainly could not afford to lose even one point, let alone 6 points in a "very

competitive and challenging selection" in their own words. In a competition in which the College had assigned points to TEAS up to the hundredths and as Mr Vejar mentioned to me in the answer to my inquiry in 2022 about the point assignment that decimals count, how the applicants could afford thinking about their attendance in the sonography lab as "voluntary"?

250.   We did not have any other option. Whether we acted as patient for them or we wouldn't be accepted in the program as Ms Caldwell told me in the conflict scene in the lab. They controlled us and forced us to do for them free labor by inserting those 6 hours in the categories for selection which did not represent any qualification that was considered essential for successful prospective applicants.

251.   As I explained in my lab incident with Ms Kara Caldwell she literally threatened me that if I did not follow her orders in the sonoraphy lab I could not be able to apply to the program and accepted. I was scolded, ridiculed, blamed, and insulted in my first session in their lab by Ms Strong as if I was a criminal or I owed something to them.  Ms Strong ridiculed me and coerced me by saying "it was none of your business"; I was fighting back my tears, I was so embarrassed and humiliated, yet I was afraid and very worried not knowing how that encounter was going to affect Ms Strong's first impression about me, since she was the program Director and was responsible for the selection of the sonography students. I was so

distressed about the intimidation of Ms Kara Caldwell that I could not be accepted to the program.

252.   If the applicant was not accepted to the program in two years period she should repeat those 6 hours again for the coming year.  The College used the applicants, for at least 84 (approximate number of applicant) ×6= 504 hours of free work each year! We even did not receive any appreciation or thanks. If it was not given 6 points in the selection criteria I would not have worked for them free as a patient in their sonography lab. Besides, I would not have been forced to tolerate the emotional pain and distress they inflicted on me in my first session and the physical pain and stress they caused me for all those hours I had to plan to be in their lab or while in their lab and also after the lab, suffering the pain and discomfort of pressure from the scan probe! The College could have asked the sonography program students to play patients for each other alternatively instead of abusing the new applicants. I and also other applicants had to work for them to gain those 6 precious points to get into the program. Yet, at the end they rejected me anyway, because I was not in their selected list of the students decided in advance.

253.   From "Justice.gov"

**Forced Labor**

**18 U.S.C. § 1589**

Whoever knowingly provides or obtains the labor or services of a person--

(1) by threats of serious harm to, or physical restraint against, that person or another person;

(2) by means of any scheme, plan, or pattern intended to cause the person to believe that, if the person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint; or

(3) by means of the abuse or threatened abuse of law or the legal process,

*shall be fined under this title or imprisoned not more than 20 years, or both. If death results from the violation of this section, or if the violation includes kidnapping or an attempt to kidnap, aggravated sexual abuse or the attempt to commit aggravated sexual abuse, or an attempt to kill, the defendant shall be fined under this title or imprisoned for any term of years or life, or both*

"Involuntary servitude" or peonage means that **a person is being made to work against his or her will, with little control over his or her working conditions**. The work might be paid or unpaid. The basic idea is that a person is being forced to **work to pay off a debt, avoid punishment or because he or she has no choice**."

254. Ms Strong, Mr Sass, Ms Alexander, and the College, threatened us into working for them free and give them free service by using our time, our bodies, our health, and our dignity while they could ask their sonography program students act as patients for each other. We did not have much choice about which area of our body was supposed to be scanned; it depended on where the scanner student was in her schedule. One time for example the student scanned my ovaries and uterus,

which caused me a lot of discomfort both physically and emotionally; it required to expose my belly and pelvis area which I was not comfortable with, but I did not have any other choice. I already was mistreated in my first session in their lab by Ms Caldwell and Ms Strong, and I did not want to be in the center of another scene and conflict one more time in their lab.

255. They used us for their program and for the College to achieve higher rates through improving their students' clinical abilities by <u>practicing on us as patients, or actually Guinea pigs</u> by offering more time and more bodies to practice on by their students. **We did not have human dignity; they just saw us as bodies to scan for their clinical practice.** It is extremely inhumane that they forced us, the applicants, to act as patients in their sonography lab all these years. What the College, Ms Strong, and Mr Sass, and Ms Alexander did all these years by abusing us, the applicants, to work for them free and in my case they even directly intimidated and insulted me, was illegal and against the 13th amendment of the US Constitution. **Their including of those 6 hours of sonography lab presence in the admission criteria was against the 13th amendment of the US Constitution law and they did it for years; they threatened us into doing it for them or accepting losing our chance of entering the sonography program and therefore accepting the harm.** **If we did not work for them free as patients we would lose our**

opportunity for education, job, and liberty; they conditioned our life and liberty to doing free labor for them!

256.  As a direct and proximate result of defendants' unlawful and illegal criteria forcing and threatening the plaintiff to work for them under their own conditions as Ms Caldwell and Ms Strong forced me in the sonography lab, Plaintiff has sustained emotional and physical injuries and damages. I was threatened that I could not apply and be accepted to the program directly by Ms. Kara Caldwell, ridiculed, coerced, insulted and harassed by Ms Strong because I was afraid of being scanned by their students for one continuous hour. Besides tolerating all the physical discomfort caused by the sonography probe, cold gel, pressure of the probe on my internal organs, I felt strongly distressed and dehumanized in a very hostile and abusive environment that only used me for their profit and the College's elevation to higher levels without considering my emotional and physical well-being.

257.  I request this Court to punish Ms Strong, Mr Sass, Ms Caldwell, Ms Rebecca Alexander, and the College for their illegal and inconsiderate abuse of their authority and power to get us to do free labor for them and for exposing us, the applicants, to pain, distress, physical and emotional harm for their profit by including six hours of acting as patient in their sonography lab in return for 6 points in our selection process. They used the word "Voluntary" without acting upon it.

They violated our 13th amendment right. **If it was voluntary we should not have been conditioned with doing it or losing 6 points in our competitive selection.** What's more they should not have coerced me, threatened me, intimidated me, ridiculed me, and insulted me into doing something that they claimed was only "Voluntary" or optional.

258.   Now, in their 2022 application form, as a consequence of my complaint to the College, TCSG, and OCR they have removed this category from the selection process without acknowledging that what they were previously doing was illegal and was violating the applicants' 13th amendment right. They have written in their "Application process- Updated September 2021" (exhibit 38) "Complete volunteer hours in the sonography lab _if desired_. … Applicants entering the DMS program will receive bonus points during their first semester for volunteering. Any student truly interested in this profession should volunteer in the lab as it is a valuable informative experience." It is clear that they have changed their tune drastically. Now, they even promise bonus points after being accepted to the program! They do not seem to force those 6 hours anymore, although there is a mild note of threat in the last sentence as warning the students that their avoidance of those volunteer hours **shows that they are not interested in the sonography program (and therefore won't be selected!),** They kind of seem to beg the applicants now, instead

<u>of coercing them into forced labor!</u> And at least they had to remove the apparent point assignment for those "volunteer" hours. Although behind the scenes they choose the students according to their pre-selected list as they did in 2017.

259.   I request this Court to punish the defendants, Ms Strong, Mr Sass, Ms Alexander and the College according to the law and as the Court deems appropriate for their unlawful conduct and abusing their power and authority for coercing the applicants into free labor, especially me; they threatened me, ridiculed me, intimidated me and harassed me because I was anxious and just wanted to wait for a few minutes longer before being scanned.


## Count 6
## False Advertisement and misleading

260.   Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

261.   **In the "Applicant assessment check List" (exhibit 1, 33) of the College on the top right corner inside a box is written: "Classes may be retaken in efforts to increase one's GPA, however, the course grades will be averaged together to calculate the applicant's pre-requisite GPA."**

262.   I remember before our Anatomy and Physiology Lab final exam, our instructor was begging the students not to retake the course if they pass it…; at that time I did not know at all that the courses could be retaken!

263.   The College deceived students into taking the courses again and again with the hope of increasing their GPA, while they knew better in 2016 that by their allocating 48 points to interview, GPA did not stand a chance to their interview! Or in 2017 that the ratio of TEAS/GPA = 2.5, the College should let the students know that TEAS had 2.5 times more effect than GPA and should not deceitfully encourage the students to take courses again and again and pay again and again to Gwinnett Technical College with the hope of increasing their GPA and therefore their competitive selection chance.

264.   The live example is me, with a GPA of A+. Even when I wrote in my complaint what happened to me they callously supported their corrupt behind the scenes point assignment for GPA which degraded GPA to 12 points from the 40 points they had promised and told me that I was not qualified for their program, period!

265.   Why they promoted higher GPA for being accepted in Sonography program? Isn't it written in their catalogue they value transparency, honesty, integrity…? And that they say what they mean? Why they encouraged students to pay again to retake

classes when they had a disregard for GPA?! This is misleading and misrepresenting the facts. This was encouraging the students to harm themselves by paying more, wasting Federal aid money, spending more time, taking more efforts, and putting themselves under a lot of stress only end up being disqualified!

266.    One more thing in this advertisement that I want you to notice: despite TEAS that you could take the exam twice and then submit your higher score, in case of GPA calculation the average of the course grades would be used not the better grade that the student got in that retaken course! Again an apparent double standard for TEAS and GPA! Why? To make TEAS more competitive and GPA worthless but in a hidden way. In the announcements they pretended GPA was important, but actually in their selection process and patterns it is evident that TEAS was preferred. Why? Because TEAS is their tool that gives them the control of the process, the systemic discrimination in this program of study.

267.    As a direct and proximate result of defendants' unlawful discrimination, Plaintiff has sustained injuries and damages: They induced the belief that the higher my GPA the better chance I had in the competitive selection by falsely advertising that retaking GPA and increasing it would give the students a better chance in their competitive selection; I believed what they said and spent all my time and energy to increase my GPA since it was also advertised that GPA had 40 points, 10 points

more than TEAS and therefore the most important factor in the selection process; while in fact behind the scenes they had given GPA only 12 points. The above issues caused me to be disqualified from the competitive selection because I relied on their false advertisement and their misrepresented selection criteria that gave GPA 40 points as being true and honest.

268.   Therefore, I request this Court to consider punitive punishment, and any other type of punishment that is legally appropriate to be imposed to the College, because of false advertisement and using students' trust for mere financial gain from their students, causing the students to waste their own money, federal money, and their time and energy and go through a lot of stress. As the result of the College's dishonesty students like me were disqualified by the College and were harmed and rejected, because the College did not reveal that the GPA was not the most important factor in the selection process. Before the submission of applications, GPA was advertised and announced to be the most important factor in the competitive selection by showing to have 40 points, but **after submission of the applications GPA became <u>only one factor in selection</u>, as Ms Alexander mentioned in her response letter to me.**

# Count 7

# Administrative Procedure Act

## [PUBLIC LAW 404—79TH CONGRESS]

## [CHAPTER 324—2D SESSION]

## [S. 7]

AN ACT To improve the administration of justice by prescribing fair administrative procedure

## Against Office of Civil Right- Atlanta, Dallas

269.   Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

270.   In June 2017, I submitted my complaint against Discriminatory selection process of Gwinnett Technical College for their sonography program which resulted in my rejection to OCR Atlanta. They accepted to investigate and I provided them with all kind of evidence I could get my hands on; I was forbidden by Mr Sass and the College from access to the information regarding their selection process and my point status in comparison to other applicants. I did not know and to this day I still do not know if I could request OCR to subpoena on my behalf documents and information from Gwinnett Tech that could help me establish more firmly my claim by getting my hands on the statistical data of the applicants' points. OCR did not give me any necessary information about my rights and if I could demand the

College to provide me with their records relevant to the application process and the results.

271. OCR Atlanta took more than two years to write a letter of denial to me on Sept. 2019. OCR Atlanta stated that they investigated the following legal issue:(exhibit 17) "Whether the College subjected the Complainant to different treatment on the basis of national origin in noncompliance with Title VI and its implementing regulation at 34 C.F.R. part 100.3(a) and (b)"

272. I read the above mentioned rule, 34 C.F.R. part 100.3(a) and (b) and its implementing regulations, Title VI manual by DOJ, also read the Title VI manual by OCR; in no paragraph of the above mentioned documents I found that the agency is limited to investigate the alleged discrimination solely on the basis of the recipient's different treatment of the Complainant; furthermore the instructions do not limit the investigation to direct evidence. As in DOJ manual also mentions it is very rare that the recipient's discrimination intention was directly stated whether orally or in written form. The DOJ manual also stated that most cases of discriminations need indirect or circumstantial evidence to be proved. I had already referred in my complaint that the College had used facially neutral criteria TEAS and had manipulated the assignment of points for GPA on behalf of TEAS **after submission**

**of the applications** which defeated me as a minority national origin student both in my initial complaint and in later email correspondence (exhibit 16).

273.   OCR was supposed to do their investigation on the basis of Title VI and its implementing regulation at 34 C.F.R. part100.3(a) and (b) as mentioned in their letter first page third paragraph, but they did not. They only followed the part (ii), (iii), (v) of 34 C.F.R. 34 part 100.3 (b)(1). They did not investigate based on 34 C.F.R part 100.3 (a) and (b)(2) as they said they would in their letter. In (b)(2) it emphasizes that " <u>A recipient … may not, directly or through contractual or other</u> <u>arrangements, utilize criteria or methods of administration which have the effect of</u> <u>subjecting individuals to discrimination because of their race, color, or national</u> <u>origin, or have the effect of defeating or substantially impairing accomplishment of</u> <u>the objectives of the program as respect individuals of a particular race, color, or</u> <u>national origin.</u>" The discriminatory criteria was TEAS as I had explained to them and I asked OCR to investigate the effect of the manipulation of the points for GPA on behalf of TEAS and its disproportionate effect it had on minorities and specially on me.

274.   In their report in page 3, last paragraph they wrote: " The Complainant's Application showed that she received all A's in her undergraduate courses, and the Program Director allotted her 40 points for grades- the maximum amount allotted in

this category." This is so meaningless what OCR said. Of course I got 40 points and the 40 points was the maximum. The issue is not that I did not get 40 points; the issue is that the 16th students should not have got 38 points for her GPA. She should only have got 29.33 points for her GPA (exhibit 19, 20, 21), if the College had acted upon their announcement. It was not my absolute 40 points that was important in my selection; but it was the difference of my points with the other applicants' points that was determinant of who would have the highest sum and therefore would be accepted. OCR did not pay attention to what I represented to them. The College intentionally changed the criteria behind the scenes and **after the applications were submitted** with their desired point assignment for GPA which follows no logic and no explanation to bring down the value of GPA 4.0 and defeat me. Because I had the highest GPA and GPA had the highest points among all other categories, the only way the College could reject me was to change the GPA point assignments after the submission of the applications and after testing our sum of the scores on their excel spreadsheet to make the sum of the other applicants higher than mine.

275. In their Finding of Fact on page 2, mentioned the criteria for GPA range was from 24 points (2.01-2.25) to 40 points (3.751-4.0); what they talk about is that internal criteria that was designed by Ms Strong **after the applications were submitted** (exhibit 2), OCR did not consider my explanation that the College had

changed their criteria which was supposed to give 40 points for GPA just like they

gave 30 points for TEAS (exhibit 3). OCR did ignore my explanation that the

College had used the discriminatory criteria of TEAS exam which was 50% English

fluency test which was a discriminatory criteria according to 34 C.F.R Pt.100, App

B, page 321, K:Eligibility based on Evaluation of Each Applicant Under Admission

Criteria: " Recipients may not judge candidates for admission to vocational

education programs on the basis of criteria that have the effect of disproportionately

excluding persons of a particular race, color, national origin, sex, or handicap."

(exhibit 40) and a few lines later it states "standardized tests, such as the Test of

Adult Basic Education (TABE) as a discriminatory criteria for that purpose.

276.   In 34 C.F.R. Pt. 100.App B, L: **Eligibility of National Origin Minority**

**Persons With Limited English Language Skills:"Recipients may not restrict an**

**applicant's admission to vocational education programs because the applicant**

**as a member of a national origin minority with limited English language skills,**

**cannot participate in and benefit from vocational instruction to the same extent**

**as a student whose primary language is English. It is the responsibility of the**

**recipient to identify such applicants and assess their ability to participate in**

**vocational instruction."**

277.   The above is exactly included in my claim and my allegation when I wrote to OCR and asked them to investigate my case; I even sent them the relevant rule. This is why I was rejected from the sonography program, because I did not score in TEAS exam in the "exemplary" classification which was from 90.7 to 100 percent what most of white American students scored. Because of the discriminatory nature of TEAS exam which is 50 % English proficiency test, my score from TEAS was 86%, and I was in "advanced classification from 78 to 90% (exhibit 34). As it can be seen in this exhibit the publisher does not distinguish between these two classifications of the students: "Students at this level are not likely to require additional preparation for the objectives assessed on ATI TEAS." But the College made their selection mainly according to TEAS scores while the publisher of the exam classified both groups with the same degree of preparation.

278.   OCR ignored the evidence and the relevant rules that I sent them. They relied only on the direct evidence of different treatment and wasted 26 months. They did not plan their investigation according to my allegations, and the facts and evidence that I represented to them and according to the rules and guidelines of OCR and DOJ. OCR did not work on important statistics in proof of disproportionate effect of the College's discriminatory criteria on minority groups. OCR did not answer my questions about how many of those 16 accepted applicants

were white American? OCR did not answer my question that how many of those 16 accepted students had GPA of 4.0? OCR did not answer my question about how many of 4.0 minority students were rejected from the program? OCR did not answer me what was the average GPA of those 16 accepted applicants? OCR did not investigate that those 16 accepted applicants were mostly accepted based solely on their high TEAS score and were the students with the highest TEAS score. OCR did not reveal any statistics that could show disparate effect of the College's criteria, even when I asked. OCR took side with the College, they were not impartial.

279.   In 34 C.F.R, Pt 100, App. B: M: Remedial Action in Behalf of Persons with Limited English Language Skills: "If the Office for Civil Rights finds that a recipient had denied national origin minority persons admission to a vocational school or program because of their limited English language skills or has assigned students to vocational programs solely on the  basis of their limited English language skills, the recipient will be required to submit a remedial plan that issues national origin minority students equal access  to vocational education programs." OCR did not investigate my allegations of the College's facially neutral discriminative criteria of TEAS exam and their manipulation of the points for GPA in order to give more points to TEAS. I mentioned that the College, Ms Strong, Mr Sass, and all involved cleverly had designed facially neutral criteria which was

facially the same for all applicants but in nature was discriminatory and had adverse effect disproportionally on minorities and specially on me who was a minority national origin student whose mother tongue was not English and also was not given any extra points for my GPA like other students with lower GPAs (example of bank account exhibit 25, that shows a criteria which seemed to be the same for all the customers but had adverse effect on some but not all).

280.   OCR had the responsibility of investigating that the minority applicants particularly me were disproportionately affected by the College's admission criteria TEAS and the methods of assigning points to that special criteria vs. GPA. Even after they found out that the 16th applicant was only 1.17 points ahead of me, the OCR did not do any investigation about my allegations of the College's manipulation of GPA points **after submission of the applications** that had caused her to have 1.17 points more than me.

281.   OCR did not do any investigation to gain statistics of how hard the minority students were affected in 2017 application process, and also in prior years' processes when the College had selected the students based on their interview scores, another subjective and discriminatory criterion, which was even later prohibited by TCSG. OCR in paragraph 3 of "Analysis" on page 5 of their letter wrote: "Further, although the evidence shows that some students, including white

students, were submitted into the Program **that had lower scores on certain criteria (e.g. GPA) than the Complainant;** the evidence[s] shows that <u>the applicants selected for the Program had higher overall scores on their Application than the Complainant."</u>  **This was exactly the point that I had asked OCR to investigate, that the manipulation of the points for GPA and rendering 4.0 GPA worthless by making the gap between it and the lowest GPA only 12 points instead of the promised 40 points had caused TEAS score to be exaggerated and caused  those white American students with higher TEAS scores and lower GPAs to be submitted to the program by gaining higher points than me.** One of the investigations that OCR was supposed to do was very easy; they should just do the observation that those 16 first applicants who were selected for the program had the highest TEAS scores and that was the reason that their total score was higher than the other students, which means that TEAS score was the predominant factor and the decision maker, despite the dishonest representation of GPA value more than TEAS by ten points.

282.  I explained everything so clearly to OCR several times. They intentionally cooperated with the lawyers of the College. OCR was not impartial. All these two years, what they were doing in Dallas OCR? They were negotiating with my opposition while I was kept in dark and waiting. What they needed these two years

for? They wrote me in two lines that my appeal was rejected without any explanation.

283.   Part of the manipulation of GPA points has been also mentioned in OCR letter (exhibit 17) page 4 paragraph 2: "Sixteen other applicants to the Program in addition to the Complainant had a 4.0 GPA, which also earned them 40 points. There were 35 other students that also received 40 points because their GPAs fell within the 3.751-4.0 range, per the admissions criteria." But, the table that OCR talks about it (exhibit 2) for GPA was not the admission criteria; it was the table Ms Strong designed later **after submission of the applications**. The admission criteria was 40 points for GPA just the one Ms Strong assigned to TEAS (exhibit 1) which I sent to OCR in the form of an excel spreadsheet(exhibit 19) with the exact formula in (exhibit 20, 21). OCR did not pay attention to my explanations. I several times explained to OCR that the College had not acted according to their criteria, and the one I had received from Ms Strong after my rejection, which was given by the College to the OCR for investigation, was not the criteria they were supposed to use for applicants' selection. No applicant knew that they were supposed to assign 3.751 GPA, 40 points!

284.   From OCR manual page 16:

**"The following essential elements of case planning will be addressed in every OCR file (unless inapplicable):**

• <u>The allegations</u>;

• <u>OCR's jurisdiction over the subject matter and entity</u>;

• <u>The legal standards, regulatory authority and elements of proof;</u>

• Ensuring that OCR's actions comport with First Amendment principles;

• <u>The scope of the investigation;</u>

• <u>Investigative methods</u> (i.e., what data and/or information are necessary to resolve the case and the means and methods OCR will employ to obtain the relevant data and/or information); and

• The resolution strategy"

285. Based on the above instructions from OCR manual, OCR started wrong from the beginning; they did not pay attention to my allegations at all. They did not follow the legal standards, regulatory authority and elements of proof; as I explained in above paragraphs they did not follow 34C.F.R. Pt 100.3 (b) 2 and pt. 100, App B, K, L and M. They only investigated the different treatment by the recipient and direct evidence! OCR did not use any circumstantial proof that I had alleged in my appeal letter referencing them to the DOJ manual for Title VI, like foreseeable impact, departure from last year's criteria for GPA points which was GPA×10,

history of using subjective criteria "Interview" and giving it 48 points vs. 40 points of GPA, disproportional effect and the graduate photos showing 80-90% white American students, also my proved prima facie case, etc.

286.   They did not use correct  necessary Investigative methods (i.e., what data and/or information are necessary to resolve the case and the means and methods OCR will employ to obtain the relevant data and/or information); I even sent OCR Texas the complete DOJ manual and refereed my allegations to the highlighted parts of the manual, to indirect evidence, to circumstantial evidence, to history of discrimination, to foreseeable impact, to facially neutral discriminatory criteria like **The _Arlington Heights_ mosaic of factors from DOJ manual** example, parts of the manual regarding the statistical evidence "statistics can be used show that a ostensibly race-neutral action actually causes a pattern of discrimination, a racially disproportionate impact, or foreseeably discriminatory results.", I proved that the discriminatory effect of their criteria was foreseeable for the College, as it is also mentioned in 34 C.F.R that **standardized tests are part of the discriminatory criteria**.

287.   I showed the double standard and controversies that College had in their criteria as also proved in the previous paragraphs as a proof of their intention. The other categories that they chose like that three points for completing all required pre-

requisites for example did not show any superiority in qualification since any student just passed the courses would receive those 3 points; they College never intended to get the higher qualified students in their program. What I mentioned in the previous statement contradicts what they claim. They were not looking for superior qualification when they decided to introduce TEAS as the selection criteria and to manipulate GPA points, either.

288.   I proved my prima facie case in my appeal letter with the data about the last accepted applicant, i.e. the applicant number 16 from the OCR Atlanta letter of findings to me which stated that she was a white American student with total points of 1.17 ahead of me. **I proved that if the college had not treated her differently than me by rewarding her extra points for her GPA** through that post hoc unofficial point assignment for GPA which was **created after submission of the applications** and **if the College had stayed loyal to their announcement for GPA points** just like they did for TEAS, **I would have been 7.5 points ahead of that student.** OCR Dallas and Atlanta both ignored my prima facie case.

289.   They also ignored the College's evident white American students' dominant population in the sonography program from the beginning of the sonography program in the College for more than 10 years. I sent the graduate pictures to them that showed 8-9 out of 10 students were white American, and they had the

opportunity to do more investigation themselves. They did not take my case seriously and did not plan their investigation properly.

290.   I even brought this example from DOJ manual page 63/138 to their attention as a very similar example to my case: "A facially neutral NCAA rule (Proposition 16) raising the minimum academic requirements for incoming college athletes to qualify for athletic scholarships and compete in college sports applied to all incoming college athletes but had a statistically greater adverse impact on black athletes. The NCAA was aware that the impact of the proposed rule would reduce the number of black athletes qualifying for athletic scholarships, and adopted the rule specifically to promote higher academic standards among black athletes. The court held that plaintiffs had stated a claim of purposeful discrimination under Title VI. *Pryor v. NCAA*, 288 F.3d 548, 562 (3d Cir. 2002). *Pryor* directly addressed the *Arlington Heights* standards for intentional discrimination, concluding that the plaintiffs met the intent test where the NCAA had actual notice and knowledge of the impact on black athletes, and affirmatively considered that impact in 14reaching its decision to adopt Proposition 16."

291.   Page 19 of OCR manual , **Letter of findings**:

"For insufficient evidence determinations, OCR will issue a letter of findings that explains the reasons for OCR's decision to both the recipient and the complainant.11"

**Letters of findings** will address all allegations opened for investigation. The letter includes, as appropriate:

• A statement of the allegations opened for investigation;

• A statement of OCR's jurisdictional authority, including recipient status and the statutory basis for the investigation;

• A statement of the findings of fact for each allegation investigated, supported by any necessary explanation and/or analysis of the evidence on which the findings are based;

• Conclusions for each allegation that reference the relevant facts, the applicable regulations and the appropriate legal standards; and

• A statement that: "The complainant may have a right to file a private suit in federal court"

292.   I received the answer to my appeal after a long period of waiting, a few days short of two years! **In the OCR manual it says that the recipient has 14 days in order to reply to the allegations in the appeal letter.** Why it took the OCR Dallas **two years** to tell me that my appeal letter was rejected without giving me any

explanation. OCR Atlanta and Dallas did not respect me and my constitutional right. **They delayed my case without any good reason.**

293.  OCR manual page 23: "… Any response to the complainant's appeal must be submitted to OCR within 14 calendar days of the date that OCR forwarded a copy of the complainant's appeal to the recipient.

**OCR will issue a written decision on the appeal to the complainant for appeals of determinations under Section 108 and to both parties for appeals of determinations under Section 303(a)."**

294.  OCR manual page 18: **"(a) Insufficient Evidence Determination:** When OCR determines that the preponderance of the evidence does not support a conclusion that the recipient failed to comply with applicable statutes and regulations, **OCR will issue a letter of findings to the parties explaining the reasons for its decision.** See CPM subsection 303(e)." After two years keeping me waiting with no update on my case, during which I wrote several email to get an update, was just told that the case was still under investigation; only one day after my last inquiry, the OCR Dallas wrote to me: "After careful consideration of your appeal, I find that **the issues raised in your appeal** do not warrant a change in OCR Atlanta's disposition of your case **under the laws and regulations enforced by OCR**. Accordingly, your appeal is denied."

295.   In my appeal (exhibit 22) I had proved my prima facie case, and I had referenced all my allegation and proof to DOJ manual, and had asked them to answer one by one to my allegations. **I knew that they will dodge my questions and that was why I requested them to answer my allegations one by one and specially to show what if anything was wrong with my prima facie case.** If my Appeal case warranted 2 years of OCR Atlanta and Dallas investigation, then it deserved to be replied according to due process which was stipulated in above paragraphs and in page 19 of OCR manual by a Finding letter. That was my constitutional right to receive a duly prepared Finding letter that explained "a statement of finding of facts for each allegation investigated, supported with any necessary explanation and/ or the analysis of evidence on which the findings are based. Conclusions for each allegation that reference the facts, the applicable regulations, and the appropriate legal standards."

296.   After receiving their email, I wrote them via email and asked them for explanation. I wrote to OCR in general, OCR Atlanta and OCR Dallas, but I did not get any answer. I felt very bad. I respected and trusted them and waited four years and two months for their investigation to conclude. They did not find me to deserve an explanation. I wonder if this is the due process of OCR as how to finalize the cases trusted to them?! I am very dissatisfied with the way they treated me. They did

not follow any of the procedures of their own manual; how can I trust them in investigating the College?!

297.   From OCR manual page 6 : "For OCR to establish subject matter jurisdiction, the written information must allege, or OCR must be able to infer from the facts given, an allegation of: … (3) **retaliation** for the purpose of interfering with any right or privilege secured by the civil rights laws and regulations enforced by OCR, or as a result of making a complaint, testifying, or participating in any manner in an OCR proceeding. *See* 34 C.F.R." **Therefore, they had also jurisdiction over the retaliation that Mr Sass showed on July 11 towards me** when I was in a meeting with Ms Tavia Thurmond to get some input about my point status in the selection process; Mr Sass intruded into the room, ordered Ms Thurmond not to talk one more word with me, because as he said she was his worker. Then called police on my husband and me to throw us out of the building 200 of the College, because he said I should have waited for my complaint to go through the process. Mr Sass deprived me of my right of free speech and getting information about my status on the sonography selection process to which I had applied, and behaved with me and my husband in the most condescending way by talking to us as his inferiors and throwing us out of the College. I wrote about this

incident in my complaint letter to OCR. OCR did ignore my retaliation complaint against Mr Sass; they never mentioned anything about it.

298.   From DOJ Title VI manual page 121/138: **"The Supreme Court has defined retaliation as an intentional act in response to a protected action.** Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 173-74 (2005). Citing Jackson, the court in Gutierrez underscored the intentional nature of a retaliation complaint: "Retaliation is, by definition, an intentional act. It is a form of "discrimination" because the complainant is being subjected to differential treatment." Gutierrez, 2005 WL 2346956, at *5."   As I was banned from access to the information about my status among other applicants by Mr Sass, because I had complained.

299.   And from footnote 3, page 123/138 of DOJ Title VI manual: **"A recipient violates Title VI if it retaliates against a private individual who opposes a discriminatory action or participates in a matter alleging discrimination whether the underlying matter concerns intentional discrimination or disparate impact.** As noted above, retaliation is a form of intentional discrimination, which Title VI clearly covers. See Jackson, 544 U.S. at 173-74 ("Retaliation is, by definition, an intentional act."). **If a recipient intentionally takes an adverse action against an individual because he or she alleged that it violated Title VI, it**

**should not matter whether the alleged violation raises an intent or disparate impact claim,** <span style="color:red">particularly within the administrative setting."</span>

300.   Even in the last page of OCR Atlanta letter of finding they wrote: "Intimidation or retaliation against complainants by recipients of Federal financial assistance is prohibited. No recipient may intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by the laws OCR enforces, or because one has made a complaint, or participated in any manner in an investigation in connection with a complaint." I don't know why they included this paragraph in their letter when they did not acted upon it themselves?

301.   As a direct and proximate result of defendants' unlawful discrimination, Plaintiff has sustained injuries and damages: OCR delayed justice for 4 years and two months, as I stated in above paragraphs OCR did not pay attention to my allegations; OCR did not followed their agency and DOJ's rules, regulations, guidelines and instructions in any of their different parts of investigation as I stated in above paragraphs; **OCR even did not think I deserved a proper "Finding Letter" after putting a four year halt to MY LIFE!** It is shameful that after keeping me waiting for all these years they did not see any need to write a "Finding Letter" although it is supposed to be their procedure as it is mentioned in their

manual. At least OCR Atlanta sent me a Finding letter although as I said their total investigation was not at all based on my allegations; but, at least they sent me a Finding letter which helped me to establish my prima facie case!

302.    **According to the Administrative Procedure Act, I request this Court to:**

(A) Compel agency action unlawfully withheld or unreasonably delayed; and

(B) hold unlawful and set aside agency action, findings, and conclusions found to be

(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) contrary to constitutional right, power, privilege, or immunity; (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(4) Without observance of procedure required by law;

(5) Unsupported by substantial evidence in any case subject to the requirements of sections 7 and 8 or otherwise reviewed on the record of an agency hearing provided by statute; or

(6) Unwarranted by the facts

303.    I request this Court to impose the most severe punitive or any other type of punishment applicable by law and deemed necessary by this Court  for OCR, OCR Atlanta and especially OCR Dallas, Ms Angela Hights, Regional Director, and Mr Thomas Stack both from OCR Dallas. OCR Texas behaved in the most irresponsible

way. All these two years they cooperated with the lawyers of my opponent while keeping me in dark. They did not act impartial.

## Relief requested by plaintiff from this Court

304.    Plaintiff was harmed: I spent two years, studied very hard, spent almost $4,000, and achieved an A+ in the certificate level in preparation for the competitive selection in sonography degree level. The College unjustly and unlawfully rejected me from the sonography program. I lost my opportunity to get my sonography Degree and get to work in the field which the median salary for it according to ZipRecruiter is "As of Dec 22, 2021, the average annual pay for a Diagnostic Medical Sonographer in Georgia is $75,805 a year". I also took trouble of investigating, thinking, analyzing, documenting, collecting evidence and proof, preparing all my complaint letters to the College, TCSG, OCR, and finally federal court, and all other correspondence, suffering in patience while waiting for a fair and impartial judgment which I did not get. And **finally I had to study about LAW in order to prepare my complaint to the Federal Court, because there were no lawyers working for students right for admission to colleges in Georgia if the student was not disabled. All of the education lawyers are hired by educational**

**institutions.** I had to wait stressfully and in distraught each time for years patiently and with lots of pray. My husband and I were insulted and threatened by Mr Sass inside building 200 of the College on July 11, 2017. All this trouble was burdened on my family, especially my husband.

**For Count 1 through count 3 of my claims**:

**305.**   I request this Court to issue an injunctive relief for the selection process of the Sonography program in Gwinnett Technical College and take it under strict scrutiny for future violations of title VI in their selection and implementation of the admission criteria.

**306.**   I request this Court for imposing punitive damages on all the participants (Ms Strong, Mr Sass, Ms Alexander, the College, Mr Dabrowiak, and TCSG) in the conspiracy of rejecting me and supporting each other in covering up of their fault with the price of depriving hard working students like me from their constitutional right, education, working, and liberty.

**307.**   I also request this court to impose monetary compensation by the defendants to me for the loss of my education opportunity and loss of my working and earning opportunity/capacity for at least 5 years that I have been following up this case or how long this trial takes with the median salary of a sonographer in GA

which is $75,805 for each of these five years or more, which makes it $379,025 or more depending how long the case takes. I also request this Court to impose any other fines, punishment and compensation that this Court deems necessary on defendants.

308.   I request this Court to order the defendants to pay for all the Court expenses I had to pay out of pocket including the Complaint filing fee and preparation of the copies of the complaint letter and mailing fee, also any other court related expenses incurred later.

309.   I also request this Court to impose any other fines, punishment and compensation that is applicable by the Law and this Court deems necessary on defendants for their lies, dishonesty, not following their policies and procedures, having no regard for my life, future, and emotions when they unlawfully and unjustly rejected me, harassed and intimidated me and insisted they did not do anything wrong without conducting an impartial investigation.

310.   Also, I request this Court to punish the above mentioned defendants for promoting and encouraging the spirit of dishonesty and unhealthy competition among the students by making TEAS exam scores the main selection tool despite

widespread cheating and also its discriminatory effect, pretending to not being

aware of either, and after I warned Mr Darbrowiak about them.

**311.** **For count 4, retaliation by Mr Sass**: I request this Court to consider the

highest punitive punishment for the College, for TCSG and OCR for their

conspiracy in covering up the incidence, and overlooking Mr Sass's unacceptable

and inhumane behavior and obstructing my right of accessing to my file

information.

**312.** I request this Court to consider punitive punishment and/or any other kind

of punishment applicable by the Law for Mr Sass for his inhumane and illegal

conduct violating my 1st amendment right, my complaint right under title VI,

retaliation against me and hindering access of any information about my application

status.

**313.** I also request this Court to order the defendants to pay for all incurred

Court expenses that I had to pay out of my pocket, including the fee for filing the

complaint, the expenses for preparing the copies and mailing of the complaints,

parking fee and all other court relevant fees.

**314.** **For count 5, exploiting the applicants in violation of the 13th**

**amendment of the US Constitution**: I request this court to consider the harshest

applicable punishment according to the Law for Ms Strong, Mr Sass, Ms Alexander, the College, Mr Dabrowiak and the TCSG that even in 21st Century ventured to such an inhumane and condescending cruelty and abused their power and authority to use us, the applicants and coerced us into free labor for them with no choice and for their own benefit and profit in the College's sonography program without any regard for our Constitutional right, our dignity, and our emotional and physical well-being.

**315.**   I also request this Court to order the defendants to pay for all incurred Court expenses that I had to pay out of my pocket, including the fee for filing the complaint, the expenses for copies and mailing of the complaints, parking fee and all other relevant fees.

**316.**   **For count 6,  False advertisement and misleading**: I request this Court to impose any punishment applicable by the Law on Ms Strong, Mr Sass, Ms Alexaner, the College, Mr Derek Dabrowiak and TCSG for deceiving students into retaking the courses without any proof that it would increase the students' chances in being accepted in the sonography program. **The College deceived the students to retake the courses and spend their own money or federal aid money for the gain and profit of the College while they intentionally behind the scenes betrayed those with 4.0 GPA and lowered the worth of GPA by changing the**

**points assigned to GPA and failing 4.0 students! The College deceived the students when they equated 3.751 GPA to 4.0 GPA behind the scenes, while they had persuaded the students for gaining as high GPA as possible by retaking their courses!** As my rejection with the highest possible GPA, i.e. 4.0 is the best evidence that <u>the College knowingly promoted higher GPA only for their financial benefit, while they never did pursue higher GPA and never intended to accept the students with the highest GPA. As a matter of fact they intentionally degraded the GPA!</u>

317.    I also request this Court to order the defendants to pay for all incurred Court expenses that I had to pay out of my pocket, including the fee for filing the complaint, the expenses for copies and mailing of the complains, parking fee and all other relevant fees incurred later.

318.    **For count 7, Administrative Procedure Act against the OCR procedures applied to my case:** First of all I am very disappointed with OCR, especially OCR Dallas, which knowingly cooperated with the College's lawyers against me, wasted my time, and delayed me from taking my case to the federal court. My requests for this count is written at the end of my claim number 7, and I repeat them one more time here since it is very important as we trust this agent to act honestly and impartially according to the Law and following the procedures in place:

**I request this Court to:**

(A) Compel agency action unlawfully withheld or unreasonably delayed; and

(B) hold unlawful and set aside agency action, findings, and conclusions found to be (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) contrary to constitutional right, power, privilege, or immunity; (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; 4) Without observance of procedure required by law; (5) Unsupported by substantial evidence in any case subject to the requirements of sections 7 and 8 or otherwise reviewed on the record of an agency hearing provided by statute; or (6) Unwarranted by the facts

**319.**    I request this Court to impose the most severe punitive or any other type of punishment applicable by the Law on OCR, OCR Atlanta and especially OCR Dallas, Ms Angela Hights, Regional Director, and Mr Thomas Stack both from OCR Dallas, that overlooked the College's discriminatory criteria, TEAS and the College's discriminatory and illegitimate point assignment to GPA which exaggerated the discriminatory effect of TEAS, even **created after submission of the applications.** The OCR, especially the Dallas OCR chose to stay silent after I sent them my appeal with my proved prima facie case. Dallas OCR did not even think I deserved a Finding Letter for my denied appeal after keeping me waiting for

two years. **They approved the discrimination that had been taking place in the sonography department of Gwinnett Technical College for years and especially in 2017 against me, even after an A+ student had fallen victim to the College's discriminatory practices and <u>helplessly asked them for help.</u>** <u>**The fact that they did not give me a Finding Letter is evidence that they cooperated with the College in the discrimination against me and were not impartial!**</u> **<u>They, too discriminated against me! The very agent that I trusted to defend my right betrayed me and interestingly they could not even explain why they rejected my appeal!</u>**

**Attached Exhibits Numbers:** **1, 2, 3, 9, 11, 12, 19, 21, 22, 23, 25, 29,33, 35, 36, 41,42.Due to the large volume of the exhibits only the above exhibits are presented attached to this complaint letter; the rest of the exhibits will be presented in the later stages of the lawsuit whenever necessary.**

*Zadoorian*

**Roobina Zadoorian**

**Date:** 03/04/2022

**4120 Tree Summit Parkway**

**Duluth, GA 30096-8053**

**Phone: 470-723-2794**